[Civ. No. 20679. Second Dist., Div. Two. Feb. 8, 1957.]

VERA A. NEW, Appellant, v. ROBERT NEW, Respondent.

Wood, Crump, Rogers, Arndt & Evans, Guy Richards Crump, Stanley M. Arndt and Morris W. Young for Appellant.

Hanna·& Morton, Harold C. Morton and David A. Thomas for Respondent.

ASHBURN, J.—Plaintiff appeals from a judgment which rejects her claim that defendant, her former husband, wrongfully appropriated to himself a "corporate opportunity" which belonged to two corporations in which he held stock and that he is obligated, by property settlement agreement and decree of divorce, to pay her 25 per cent of the proceeds of such misappropriation.

By property settlement agreement of December 6, 1943, and ensuing divorce decree, the parties divided their community property. The wife received the home and its furnishings together with an automobile, and the husband took a second car. The community property also included 600 shares of capital stock of Continental Corporation and six shares of Continental Development Corporation, both incorporated under the laws of California. Each of these corporations had also issued "compensation interests" which were actually certificates of participation in the net proceeds of certain oil properties operated by them respectively. The New holding consisted of a 17 per cent interest in the net income of Continental and 20 per cent of the net income of

Development.[1] A 4 per cent interest in Development income was put in trust for the minor child of the parties and the remainder divided equally; each spouse took 8 per cent of Development income and 8½ per cent of that of Continental. The shares of stock in both corporations were awarded to defendant husband as his separate property. The property settlement agreement, in which the wife was designated as first party and the husband as second party, was carried into the divorce decree. Paragraph 14 thereof provides: "Second party hereby covenants and agrees, from and after the date of this agreement, that he will pay first party twenty-five per cent (25%) of any and all sums, proceeds, benefits, re-munerations, compensation and emoluments of whatsoever kind or nature (excepting any director's fee which he may be entitled to, and excepting any proceeds or benefits that second party may be entitled to by virtue of the interest which he retains in and under said Assignment of Compen-sation dated May 15, 1940 after making the assignments pro-vided for in this agreement [)],[2] paid to second party or that second party may receive, or paid to or received by others for the use and benefit of second party, directly or indirectly, from the said Continental Corporation, the Con-tinental Development Corporation, their successors, subsid-iaries or assigns, or from any of them by virtue of any interest which second party presently has in said Continental Cor-poration, Continental Development Corporation or which he may have. Nothing herein contained shall be construed as giving to the second party any interest or any of the proceeds or benefits, remuneration, compensation or emoluments what-soever for additional interest hereafter acquired by second party by gift, device [sic] or bona fide purchase in and to the Continental Corporation and/or the Continental Develop-ment Corporation."

Continental had entered into a Drilling and Operating Agreement with Los Angeles Flood Control District (which designated Continental as Contractor) for the purpose of producing oil from wells drilled in the west bank of the flood control channel in the city of Long Beach; the docu-

---

[1]We follow counsel in referring to Continental Corporation as "Con-tinental," Continental Development Corporation as "Development," Continental Northern Corporation as "Northern" and Continental South-ern Corporation as "Southern."

[2]The court found that the parties intended to close the parenthesis at the place where we have placed the appropriate mark but that they in-advertently failed to do so.

ment in legal effect amounted to a lease, as was held by this court in *County of Los Angeles* v. *Continental Corp.,* 113 Cal.App.2d 207, 226, 230 [248 P.2d 157]. The district did not own in fee the entire channel area, having only an easement upon certain parcels of land lying therein; hence, Continental was granted the right to drill for and produce oil only from those portions which were owned in fee by the district. Of course Continental, as a matter of law, could not slant drill under neighboring property or bottom any well therein. (*A. E. Bell Corp.* v. *Bell View Oil Syndicate,* 24 Cal.App.2d 587, 595 [76 P.2d 167].) It was, however, given exclusive use of the surface of the described area for oil drilling and production, the district reserving the "right to occupy the lands herein described and to use, and to permit the use of, same for such uses and purposes for which District is organized other than the production of oil, gas and other hydrocarbon substances." The parcel covered by the agreement was originally 60 feet wide, but an amendment increased the width to 249 feet; because of the existence of Pacific Electric Railway tracks and easement, the property available for drill sites on the west bank was only 25 feet wide; in length it was over a mile. The property was divided into three parcels, A, B and C, and Continental, with consent of the district, assigned all its rights in Parcel C to Development which became substituted as to all rights and obligations of the assignor so far as concerned Parcel C. Producing wells were developed in all three parcels. By July, 1941, Continental had completed 12 wells, and by 1943 Development had nine wells, with six more to drill. Defendant New was a corporate officer of each company; he and his business associate, Mr. R. F. Ingold, owned enough stock to give them practical control of both Continental and Development (50 per cent of the former and more than 50 per cent of the latter) and they exercised such control at all times.

In May, 1944, Mr. William Smith, then chairman of Los Angeles County Board of Supervisors and chairman of its flood control committee, informed Mr. New that Associated Oil Company was seeking a lease to a portion of the surface of the flood control channel to enable it to slant drill into the area east of the channel, the proposed lease to cover lands already under the Continental drilling agreement. Such drilling was then forbidden by an ordinance of the city of Long Beach, in which the land was located. Indeed, Con-

tinental and Development had been able to drill on the west bank of the channel only after procuring a judgment of court declaring said ordinance unenforceable as to them and the property covered by their drilling agreement. Knowing that there were numerous parcels within the channel area which were owned by third parties subject only to an easement in the flood control district, which owners apparently did not realize their possession of drilling rights, New and Ingold were apprehensive lest they come to life and assert their rights to the detriment of Continental and Development. While they did not consider the area east of the channel as an especially good prospect for oil, the fact that Associated desired to. slant drill into that property alerted them to the fact that the possibilities might be considerably better than they then thought. They desired to keep Associated out of the channel and later, when Crown Petroleum Company was trying to get such a lease, they were anxious to thwart its desire. Of course that project would require as a condition of success leases from the other fee owners in the channel and community leases from owners east of the channel whose property was to be subjected to the bottoming of directionally drilled wells.

Notwithstanding the apparent obstacles to success, New and Ingold wanted and negotiated for the channel lease. Mr. Smith and another supervisor told them emphatically that no such lease could be obtained by Continental or Development. This seems to have been based upon certain political considerations. New and Ingold organized Continental Northern Corporation and Continental Southern Corporation, wholly owned by them, and the flood control district gave them channel leases which roughly corresponded to the west bank areas held by Continental and Development. This was on October 3, 1944. The leases conferred oil exploration rights limited to directional drilling, with no wells to be bottomed within the leased lands; they were expressly subject to the rights of Continental and Development under their drilling agreement. The court found: "Under the lease which Northern executed with the District, Northern was a tenant of the District, and occupied portions of the general surface area of said Flood Control right-of-way where wells of Continental and Development were located, but was limited to the production of oil only from areas outside of the Flood Control right-of-way; and Northern did bottom all of its wells in, and did produce oil only from, areas out-

side of the Flood Control right-of-way." A like finding was made as to Southern. Northern and Southern procured the necessary community leases, obtained a judgment invalidating the obstructing ordinance, and Northern proceeded to drill on February 25, 1946. On March 15th Southern began a well; in April of that year its well Number 102 pierced a virgin oil pool situated just east of a fault, now known as the Golden Avenue fault, which was previously unknown. The wells of Northern and Southern proved to be rich ones, far beyond any expectations.

Defendant sold his stock in Northern to Southern in May, 1946, for $560,000. On or about November 1, 1947, he sold his remaining stock and compensation interests in Continental, Development, Southern and Eastern[3] for $2,764,154.82, of which amount the sum of $2,623,675.14 was allocated to the shares of Southern and Eastern; certain stock which he had turned over to his second wife was also sold for $327,959.39. Of the amount received by defendant $9,960.34 was allocated to his 600 shares of Continental stock and $33,059 to his six shares of Development stock. The court found that each of said sums "was a fair, equitable amount, and was arrived at in good faith."[4] Accordingly, 25 per cent of each sum was awarded to Mrs. New, the plaintiff, i.e., $2,490.09 on account of Continental, and $8,264.75 on account of Development. She claims to be entitled to 25 per cent of $3,511,634.53, or the sum of $877,908.63, in addition to the said sums awarded to her.

Her second amended complaint, upon which the cause was tried, proceeds upon three theories, (1) that defendant New was her agent and obligated to account as such, (2) that he held the Continental and Development stock in trust and must account for any profits made by him from the slant drilling deal, and (3) that he breached an implied covenant of the settlement agreement that he should act in good faith and deal honestly concerning the subject matter of paragraph 14 thereof. The court held that the Continental and Development stock belonged to defendant as sole owner; that it was not held in trust by him, but that plaintiff had an equitable lien thereon. In effect it was held that there was no agency and no violation of defendant's obligation to act

---

[3]Continental Eastern Corporation, organized by defendant and Ingold to take over one of Southern's leases.

[4]Except as it is affected by her claim under paragraph 14 of the settlement agreement appellant does not challenge this finding.

in good faith and do nothing to rob plaintiff of the fruits of her contract.

As a matter of law it appears that there was no agency and no trust. The terms of the settlement agreement preclude any such finding. That document, the ensuing interlocutory decree of divorce which incorporated it substantially *in haec verba,* and the final decree which again incorporated it by reference to the interlocutory,—these things severed the confidential relationship previously existing between the parties and placed them at arm's length toward each other except to such an extent, if any, as a confidential relationship was created by the agreement. It recites a mutual desire "to make a full and complete property settlement in order that each of the parties can deal with his or her property, the same as though they were sole and unmarried." The wife "does hereby waive, assign, release and quitclaim all and every of her right, title and interest in and to any and all property which may hereafter be acquired by the second party or which he may now have, except as herein set forth, whether the same be separate or community property." Paragraph 16 provides: "That from this day henceforth all earnings and any property, real or personal, whether community or separate, heretofore or hereafter owned or acquired by either of the parties hereto by gift, devise, bequest, distribution, purchase, exchange, or in any other manner whatsoever, as well as the rents, issues, profits, and income therefrom, shall be the sole and separate property and estate of the party earning, owning, or acquiring the same, . . . to the end that the parties may dispose of and deal with such earnings and property hereafter in the same manner as though the marriage between the parties had never been consummated." Paragraph 18: "This agreement is intended to be and shall operate as a full, complete and final settlement of all the property rights of the parties hereto, and each does hereby waive, relinquish, release, grant, bargain, quitclaim, convey, assign, transfer, and set over, unto the other, any and all rights that he or she may have or claim against the other as husband or wife, or otherwise, arising or growing out of the marital relation, or as heir at law of the other, or otherwise, which are inconsistent herewith.

"It is the intention of the parties that hereafter they . . . will acquire, convey, and deal in property and do all business, regardless of the other, the same as if they were not married." The court correctly interpreted the agreement in

the following finding: "It was at the time of the execution of said Property Settlement Agreement the understanding and intention of the parties, and the meaning of said paragraph 14 as embodied in said Interlocutory Judgment of Divorce, that defendant should have and own as his sole and separate property the 600 shares of common capital stock of Continental and the 6 shares of common capital stock of Development except that said title and ownership should be subject to the rights in the plaintiff as hereinbefore set forth." Those rights were expressed by paragraph 14 quoted above, and consisted of the right to receive from defendant, when realized by him, 25 per cent of any and all sums, proceeds, benefits, remunerations, compensation and emoluments of whatsoever kind or nature, paid to or received by him, directly or indirectly, from Continental and Development, or either of them, or any subsidiary of either.

It is immediately apparent that defendant, in managing his solely owned stock, was not acting as agent for plaintiff. "An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency." (Civ. Code, § 2295.) Certainly one cannot be an agent and a trustee at the same time, with respect to the same subject matter. "An agent acts for his principal in a representative capacity so that the principal, rather than the agent, is ordinarily bound by a contract entered into by the agent on behalf of the principal. On the other hand, a trustee represents only the trust estate, and not the beneficiary, so that he is ordinarily bound as a principal." (2 Cal.Jur.2d § 7, p. 656.)

 An equitable lien does not create or embrace a trust. (1 Scott on Trusts, § 10.4, p. 76; Rest., Trusts, § 10, comment c, p. 33.) Indeed, such a lien is not cognizable until it has been declared by court, whereupon it relates back to the acts giving rise to the equity. (*Hise* v. *Superior Court,* 21 Cal.2d 614, 627 [134 P.2d 748].)

The parties expressly set aside a four per cent interest in the income of Development as a trust for the benefit of their daughter. By way of contrast the provisions of the agreement defining their rights with respect to each other (above quoted), studiously avoided any such relationship. Counsel for appellant concede in their briefs that "since the property settlement agreement did not contain a declaration of trust, it was not an express trust." But they insist upon some implied fiduciary obligation in the nature of a trust,—

a "voluntary trust." We perceive no basis for this. ██ Defendant's obligation to plaintiff was to pay her a percentage of anything received by him from Continental or Development, directly or indirectly. When received, he owed her 25 per cent of it, just as if he had agreed to pay her $500 cash per month if he received that much from any source. Defendant was not obligated to create a "corporate opportunity" or to remain a corporate officer or director or so to manage the corporation as to make the stock lucrative. His primary obligation was negative, to refrain from conduct calculated to deprive plaintiff of the legitimate fruits of her bargain. Referring to a somewhat similar factual situation the court said, in *Botchford* v. *Alt,* 71 Cal.App.2d 340, 345 [162 P.2d 984] : "It appears therefore, since appellant was to be paid in money, that the relationship between appellant and D. H. Botchford, in the matter of her claim to a percentage of his compensation, was that of creditor and debtor; and that she did not acquire any title to property received by him as compensation." In *Downey* v. *Humphreys,* 102 Cal.App.2d 323, 332 [227 P.2d 484] : "A debt is not a trust and there is not a fiduciary relation between debtor and creditor as such. If a person receives money and it is the intention that he shall have the unrestricted use thereof, being liable to pay a similar amount to a third person, a debt is created."

The court found that "plaintiff and defendant became obligated, and at all times thereafter remained obligated, to act toward each other with good faith and to deal honestly with each other concerning the subject matter of said paragraph 14 of said agreement as embodied in said Interlocutory Judgment of Divorce.

"There was and at all times has been, an implied term in said Property Settlement Agreement, and particularly in paragraph 14 thereof as embodied in said Interlocutory Judgment of Divorce, that neither party would do anything to deprive the other of the fruits and benefits thereof." This is an implied term of every contract. ██ "In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing. (17 C.J.S. 778, § 328.)" (*Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751, 771 [128 P.2d 665].) Being of

universal prevalence it cannot create a fiduciary relationship; it affords basis for redress for breach of contract and that is all. (See *Gonsalves* v. *Hodgson*, 38 Cal.2d 91, 97-98 [237 P.2d 656].) The trial judge properly ruled that the stock in Continental and Development was not held by defendant for the use or benefit of plaintiff.

The trial court's ultimate holding rests upon two broad grounds. First, that there was no "corporate opportunity" for Mr. New to misappropriate, and second, that he did not stand in a fiduciary relationship to plaintiff and owed her personally no duty to refrain from appropriating that opportunity if one did exist.

The first proposition presents a mixed question of law and fact, the solution of which involves numerous complex factors. To that question of the existence of the alleged corporate opportunity we now address ourselves, first adverting to the applicable rule of review of conflicting evidence.

The appellate court must accept as established all facts and all inferences favorable to respondent which find substantial support in the evidence. "And where appellant urges the insufficiency of the evidence to sustain the findings . . . the rule is that, 'Such contention *requires defendants to demonstrate* that there is no substantial evidence to support the challenged findings.' (*Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550].) (Emphasis added.) It is said in *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183], that: 'It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deduction for those of the trial court.' " (*Hartzell* v. *Myall*, 115 Cal.App.2d 670, 673 [252 P.2d 676].)

Plaintiff argues that certain of the evidence is inherently improbable and hence ceases to be substantial evidence within the doctrine of *Herbert* v. *Lankershim*, 9 Cal.2d 409, 471 [71 P.2d 220]. That case can have only narrow application, for the general rule is as stated in *People* v. *Huston*, 21 Cal.2d 690, 693 [134 P.2d 758] : "Although an appellate court will not uphold a judgment or verdict based upon

evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] ▉ Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." *Industrial Indem. Co.* v. *Golden State Co.*, 117 Cal.App.2d 519, 538 [256 P.2d 677]: "[I]t is settled law that if conflicting inferences may reasonably be drawn from the evidence, even if it is uncontradicted or all facts are admitted, which inference shall be drawn is a question for the trier of facts and its decision cannot be set aside by the appellate court. . . . Only where there is no conflict in the evidence *and no conflicting inferences can be drawn therefrom* does the finding of the trial court amount to a conclusion of law and is the finding not binding on a reviewing court."

▉ The corporate opportunity doctrine is stated in the Industrial Indemnity case, *supra*, at page 533, as follows: "Since the leading case of *Guth* v. *Loft*, 23 Del. Ch. 255 [5 A.2d 503], it has been generally accepted that a corporate officer or director may not seize for himself to the detriment of his company business opportunities in the company's line of activities which the company has an interest and prior claim to obtain, and that if he seizes them in violation of his fiduciary duty the corporation may claim for itself all benefits so obtained by him. . . . However this doctrine does not exclude the fiduciary from all business activity of his own in the field in which he works for others. ▉ '. . . The directors or officers of a going, solvent corporation cannot, however, engage in a competing business to the detriment of the corporation which they represent.' 13 Am.Jur. 953, Corporations, § 999. To the same effect 19 C.J.S. 160, Corporations, § 785; 3 Fletcher, Corporations (1947 rev.) 214-215, § 856; Ballantine on Corporations (1946 ed.) 203 et seq., § 79. ▉ The latter points out (p. 205) that the basis of the doctrine must be found 'in the unfairness on the particular facts of a fiduciary taking advantage of an opportunity

when the interests of the corporation justly call for protection,' (to the same effect. Prof. Scott in 37 Cal.L.Rev. 539, 551) and continues: 'This calls for the application of ethical standards of what is fair and equitable to particular sets of facts. The question is indeed often a close one whether the fiduciary duty of loyalty of directors and officers requires them to offer a particular business opportunity which they discover in connection with the corporate business to the corporation . . . or whether they may take it for themselves. This turns . . . upon various factors as to the needs and situation of the corporation, its financial ability and fair expectation under the circumstances, which cannot be reduced to definite rules.' Under these circumstances the decision in each case depends on its particular facts and citation of examples is not useful. ██ The determination of the particular factual circumstances under which a fiduciary takes business opportunities for himself and the application of the ethical standards of fairness and good faith required from a fiduciary to said set of facts is mainly for the trier of the facts. ██ Both the issues of good faith and of sufficient performance of contractual obligations are normally questions of fact (53 Am.Jur. p. 192, § 224; p. 231, § 273)."

██ The drilling agreement under which Continental and Development held their tenure conferred upon them the exclusive right "to drill for, produce, extract and remove" oil and other hydrocarbon substances "in and from . . . said lands" together with "the exclusive right to enter upon said lands . . . for said purposes," and to place "thereon and therein all . . . structures which Contractor may require in carrying on its operations hereunder." The district reserved "the right to occupy the lands herein described, and to use, *and permit the use of,* same for such uses and purposes for which District is organized, *other than the production of oil, gas and other hydrocarbon substances."*[5] (Emphasis added.) Though the matter is not free from doubt, we think this instrument conferred upon the contractor exclusive use of the surface so far as producing oil from the premises was concerned. The parties were not thinking about slant drilling when this document was drafted; it gave contractor the exclusive oil exploration and production rights; and the limited

---

[5]This is the language of amendment to the agreement (Ex. C) made on March 19, 1940.

nature of the reservation in favor of the district leads us to the conclusion above expressed.[6]

Continental and Development were organized for the purpose of exploiting the rights thus conferred on them; the sole business of each was drilling and operating wells under the drilling agreement, and that was the sole source of revenue of each. At the time the so-called opportunity arose, Continental had completed 12 wells and its drilling program was complete. Its by-laws provided that it should not engage in any other activity, enterprise or undertaking unless authorized by the affirmative vote of four of its six directors. Development had drilled nine wells and contemplated six more to round out its development program. When the possession of a directional lease was suggested to Mr. New he considered that it might be inimical to Continental and Development, and he therefore became active in blocking efforts of Associated Oil Company and Crown Petroleum Company to get such a lease. This he did initially as a matter of protection to the companies in which he was interested. But the chairman and one other member of the board of supervisors told him in no uncertain terms that a lease would not be given to Continental or Development, and that if he and Mr. Ingold wanted it they would have to take it in person or through another corporation. At this juncture Continental and Development were in position to block the whole project, for they held the exclusive surface rights, both legally and practically. The law then provided for an acre of land surrounding each well (Pub. Resources Code, § 3600 et seq.), and Continental or Development was in position to preempt any site which another lessee might desire to occupy. ▇▇▇ But the power to negate the enjoyment of a business opportunity by a third party, a stranger, does not constitute the kind of an expectancy which lies at the basis of the corporate opportunity doctrine.

Viewing the matter affirmatively and prospectively, we find that Continental and Development, in order to have the possibility or probability of a profitable venture, would first have to overcome the resistance of the board of supervisors.

[6]Factual differences in the cases cited by respondent to the contrary effect prevent their being controlling here. Those citations are: *Lineberger* v. *Delaney Petroleum Corp.*, 8 Cal.App.2d 153 [47 P.2d 326]; *Rennie* v. *Red Star Oil Co.*, 78 Okla. 208 [190 P. 391]; *City of Pasadena* v. *California-Michigan Land & Water Co.*, 17 Cal.2d 576 [110 P.2d 983, 133 A.L.R. 1186]; and *Callahan* v. *Martin*, 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871].

(The trial judge had a right to infer that this was not merely an objection to the use of those corporate names as lessee, but that the board insisted upon an entirely different entity and would not be satisfied with a subsidiary of the existing corporations.) Assuming this resistance could be overcome, it would involve a preliminary change in the scope of the corporate business and a departure into an activity different from that which had been consistently pursued by each existing corporation. While the leases actually obtained by Northern and Southern did not carry any fixed obligation to drill, it would have profited Continental and Development nothing to take (if they could get it) such a lease and do no development work. Directional drilling was not far advanced at that time, and was expensive. Before it could start another successful suit against the city of Long Beach was necessary in order to render the prohibitory ordinance of the city inapplicable to wells drilled into and bottomed within lands east of the flood control channel. That involved substantial expense and uncertainty. Such drilling could not be lawfully done without procuring leases (community) from the landowners east of the channel in whose properties the wells were to be bottomed. That meant a campaign of uncertain duration and dubious outcome. As a matter of prudence it was also necessary to obtain (as New and Ingold ultimately did) leases from the fee owners of lands within the channel over which the district had only an easement. It owned the fee to only about 50 per cent of the whole channel area.

If all this were accomplished successfully it would mean nothing unless pursued by a drilling campaign. While the evidence is conflicting on the point the court was justified in concluding that neither Continental nor Development had the necessary funds or ability to command the same. Continental had sold 86 per cent of its compensation interest (net income) and Development had disposed of 73 per cent of its share. Neither corporation had large working capital or reserve. It appears that Development, in order to complete its existing program by drilling six more wells, had to borrow $175,000. This it was able to do only through voluntary subordination of all outstanding compensation interests (net income from existing wells) to the claim of the lending bank; this was done by all holders except Mrs. New who was not asked to join therein. No one was obligated to make such a subordination in order to promote a slant drilling campaign, and it does not appear that the holders thereof could

have been induced to do so. Macson Oil Company, which owned 40 per cent of the compensation interest of Continental, had assigned the same to a trustee for creditors and that trustee probably would not have agreed to a new subordination. Relations between New and Ingold on the one hand and the Macson interests on the other were not cordial or friendly.

The prospect of large returns from the proposed new venture were slim. New and Ingold did not consider the geology particularly promising; they thought the oil sands were thinning toward the east. They invested their time and money in the venture chiefly as a gamble, in the belief that the Associated Oil Company had a "smart" group of men in it, and that if both Associated and Crown Petroleum wanted the lease, they could afford to speculate on it too. The Golden Avenue fault and the virgin pool lying east of it (some 700 feet east of the east boundary of the flood control channel) were wholly unknown until drilling proved their existence, and that was about a year and a half after the leases to Northern and Southern were made.

The court found: "The community oil leases obtained by Southern, and the development thereof by Southern, and the operation of oil wells bottomed therein for the production of oil, gas, and other hydrocarbon substances, were not activities of Continental and Development, or either of them;" that at no time did defendant receive "sums, proceeds, benefits, compensation or emoluments or any thereof, either directly or indirectly, from Continental and Development or from Continental or Development or from Northern or Southern by reason of or growing out of the interest and rights or interest or any right which plaintiff possessed under said Property Settlement Agreement of December 6, 1943 for the use and benefit of plaintiff, or otherwise." Again, "It is not true that all or any of the shares of capital stock of Southern or Northern issued in the name of the defendant, or all money or any money received by defendant from the sale of shares of the capital stock of Southern or Northern, were received, or was received, by defendant directly or indirectly or otherwise from Continental or Development within the meaning and intent or within the meaning or intent of the provisions of said Property Settlement Agreement dated December 6, 1943, or said Interlocutory Judgment of Divorce (Default), or said Order Correcting Interlocutory Judgment of Divorce."

Implicit in these findings are any subsidiary ones which may be necessary to support them. (2 Witkin on California

Procedure, § 118, p. 1850; 24 Cal.Jur., § 207, p. 974.) There was considerable evidence pointing to inferences and conclusions contrary to those favorable to respondent which we have stated, but the authorities preclude our weighing the facts where, as here, there is a substantial conflict in the proofs.

The trial court found in effect that the venture of Northern and Southern was not a corporate opportunity which Continental and Development, or either of them, could have grasped and pursued. We cannot say that this conclusion is not supported by substantial credible evidence.

■ If the existence and misappropriation of a corporate opportunity be conceded arguendo, it does not follow that plaintiff should prevail herein. The applicable doctrine is stated in *Industrial Indem. Co. v. Golden State Co., supra,* 117 Cal.App.2d 519, 533-534. Manifestly, a recovery on that theory must proceed solely upon the basis of a breach of a fiduciary duty. Where no such relationship exists there is no room for application of the doctrine. ■ In the case of a corporation the violation of the rule results in a cause of action to compel the faithless trustee to disgorge his profits, but the right of recovery resides in the corporation, not its individual stockholders. They can enforce it only through a derivative suit wherein they assert the corporate right. (*Anderson v. Derrick,* 220 Cal. 770, 773 [32 P.2d 1078]; *Shenberg v. De Garmo,* 61 Cal.App.2d 326, 330, 332 [143 P.2d 74].) Plaintiff herein would have no such standing because she is not a stockholder in Continental or Development.

■ If that hurdle were overcome it would immediately appear that the proceeds of such misappropriation of the corporate opportunity would not belong to defendant, but to the corporation; as defendant would be obligated to pay the entire amount to the corporation, it could not be said to have been received by him from it or on account of his stock within the purview of the contract. He not being entitled to keep those moneys, any division of same with plaintiff would render her liable to the corporation to that extent, for she affirmatively stands upon the fact of misappropriation and would take with full knowledge, thus making her liable for restitution. (Rest., Trusts, § 291, comment (a), p. 882.) Moreover, such wrongful profits, when restored to the corporation, would go into its treasury, and could be used to pay debts, increase surplus or augment working capital. If any part was used for payment of dividends or salary of

defendant, he upon receipt of same would owe plaintiff 25 per cent of it, but only in that event.

Plaintiff also claims that defendant's activities (which she has designated as wrongful appropriation of a corporate opportunity) were actionable upon another ground, namely, a violation of her rights as a holder of compensation interests. This contention must fail for reasons similar to those stated above. In the first place, her ownership is a participation in the net earnings of the corporation derived from the drilling agreement, which is carefully confined to oil produced from the lands described therein. The certificate itself limits the participation to "compensation payable to, or realized or retained by assignor under and by virtue of the said drilling and operating agreement between said District and Assignor." The assignment made by defendant to plaintiff is equally specific. Neither Northern nor Southern ever produced or acquired the right to produce oil originating in the channel or its west bank. Respondent well says: "Thus the rights of Continental and Development under the Drilling and Operating Agreement of January 30, 1939, as amended, were limited to operations on the channel *only*. Therefore, even if Continental and Development, rather than Northern and Southern, had entered with the District the surface leases of October 3, 1944, and thereafter had produced oil from the area east of the channel, as Northern and Southern did, appellant and other holders of compensation interests would not have shared in the proceeds simply because the proceeds would not have been received under the Drilling and Operating Agreement at all. Thus appellant cannot show any injury at all to her compensation interests upon which she can now maintain this action."

Secondly, plaintiff's right as the holder of a compensation interest is to receive from the corporation a share of the net income actually coming into its possession, and her right against defendant with respect thereto (if any such right there were) would be a derivative one,—the proceeds of any suit would go to the corporation, not to her, and she in due course would receive her share from it.

Appellant's counsel make an elaborate argument to show that in acquiring and pursuing the Northern and Southern leases Mr. New, Mr. Ingold, and those corporations improperly used the property, funds and credit of Continental and Development. This, if established, would fall in the same category of corporate wrong. To the extent, if at all, that it

diminished the company's assets or income it would have a cause of action, and plaintiff (as a holder of a participation certificate) could pursue a derivative action on its behalf. The present is not such a suit. Plaintiff has no individual cause of action. (*Anderson* v. *Derrick, supra,* 220 Cal. 770, 773; *Nielsen* v. *Gillespie,* 97 Cal.App. 319, 320 [275 P. 500]; 12 Cal.Jur.2d §§ 215-216, pp. 769-771.) Moreover, the court found that no such wrongdoing occurred: "It is untrue that . . . Continental or Development . . . assigned or transferred . . . to Northern or to Southern valuable or any assets or property . . . owned by Continental or Development including drilling and other rights or drilling or any rights of . . . Continental or Development under said Agreement dated January 30, 1939, as amended, or that defendant received for any such transfer of assets or property of Continental or Development any stock or any other interest of great or any value in both Northern and Southern or in either Northern or Southern."

Counsel for appellant do not seek to capitalize the implied covenant to act honestly and not to deprive plaintiff of the fruits of her contract,—to capitalize it except as a basis for imposing a fiduciary obligation upon plaintiff. The complaint allegations of breach of contract are but a paraphrase of the preceding allegations of wrongful appropriation of a corporate opportunity. They add nothing to those allegations or that argument.[7]

The portions of the judgment from which plaintiff has appealed are affirmed.

Moore, P. J., and Fox, J., concurred.

A petition for a rehearing was denied March 4, 1957, and appellant's petition for a hearing by the Supreme Court was denied April 9, 1957. Carter, J., was of the opinion that the petition should be granted.

---

[7]Counsel for both parties are to be commended for the careful, thorough and excellent briefs presented in this case. They have been of considerable help in easing the weight of a voluminous record.