[Civ. No. 26214. Second Dist., Div. Two. Dec. 27, 1962.]

NICHOLAS H. WADE, Plaintiff and Appellant, v. SOUTH-WEST BANK, Defendant and Respondent.

NICHOLAS H. WADE, Plaintiff and Appellant, v. BEKINS VAN AND STORAGE, Defendant and Respondent.

(Consolidated Cases.)

394

Marvin B. Kapelus for Plaintiff and Appellant.

John P. McGinley and Henry W. Low for Defendants and Respondents.

ASHBURN, J.—Actions for conversion of certain motion picture equipment, sound equipment, recording apparatus and

processed film footage, which plaintiff claimed to belong to him and to have been taken from his Malibu Beach studio-residence by Bekins Van and Storage as agent of Southwest Bank and without his consent. Recovery was sought against the bank in the sum of $1,400,532, plus interest and exemplary damages, and against Bekins Van and Storage in the sum of $600,000 trebled. The two actions were consolidated for trial, resulting in separate findings and judgments. Plaintiff appeals from an adverse judgment in each case.

Appellant's opening brief says: "The sole issues upon which evidence was taken in this matter were the issue of consent by plaintiff to the defendant for the taking of these items of personal property and right to possession." Respondents' brief says: "[I]t was later determined that the issue of whether or not plaintiff had *consented* to the taking of the property allegedly converted could be controlling and that issue was then tried."

Appellant makes three claims of error: (1) Rejection of evidence offered to show plaintiff's state of mind; (2) finding of consent to taking property from 18704 W. Topanga Beach Road; (3) finding of consent where same had been obtained through fraud or misrepresentation.

Appellant does not directly assert insufficiency of the evidence upon the issue of consent to the taking; he does claim that the consent, if any, extended only to Malibu Beach premises known as 18708 West Topanga Beach Road and not to the adjoining number 18704; also that such consent was obtained through fraud or misrepresentation. This calls for a determination of the sufficiency of the evidence upon these issues as well as a summarization of the proofs as a background for determining whether the court erred in the challenged rulings upon evidence and evaluating the effect of error, if any, in rejecting proffered testimony.

 Concerning the first matter, *New* v. *New,* 148 Cal. App.2d 372, 383 [306 P.2d 987], states the familiar controlling principles of review: " 'And where appellant urges the insufficiency of the evidence to sustain the findings . . . the rule is that, "Such contention *requires defendants to demonstrate* that there is no substantial evidence to support the challenged findings." (*Nichols* v. *Mitchell,* 32 Cal.2d 598, 600 [197 P.2d 550].) (Emphasis added.) It is said in *Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427, 429 [45 P.2d 183], that: "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being un-

supported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ▮ When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deduction for those of the trial court.' '' (*Hartzell* v. *Myall,* 115 Cal.App.2d 670, 673 [252 P.2d 676].)''

It appears that before appellant's marriage to Ann Dvorak in 1950, she had some property but he had none; her money was used in purchasing equipment for motion picture productions. A corporation known as Annik Productions was set up to run the business, which appellant managed. He was discharged in bankruptcy in 1953 and from that time until 1957, according to his own testimony, all he did was borrow money to enable him to produce television films; during this period he had no income. Apparently that situation continued until the time of the alleged conversion on June 15, 1957. At that time defendant bank held the joint note of Mr. and Mrs. Wade dated March 4, 1957, in the sum of $10,825, payable ''On 'DEMAND' and if no 'DEMAND' then all due September 4, 1957,'' which note was secured by chattel mortgage covering the equipment and other property which is the subject of the alleged conversion. This was a second renewal of a 1955 loan.

In May of 1957 Mrs. Wade moved out of the Malibu property and started a divorce action against appellant. As he claimed the mortgaged property or part of it to be community property, and the bank loan had been in trouble ever since 1955, the bank became concerned over the possible effect of the divorce upon the security for the note. Appellant did not have the money to pay the note. On June 7, 1957, a stipulated order was made in the divorce action containing this: That ''defendant shall remove himself on or before June 15, 1957 from the premises at 18708 and 18704 West Topanga Beach Road and shall not reenter the premises thereafter without an order of court or written stipulation of the parties. . . . Defendant is ordered to leave intact in the premises all photographic, sound, and projection equipment, furniture, furnishings, fixtures, films, recordings, and books. . . .'' Appellant continued to reside in the premises until after June 15, 1957.

In May, appellant had told Mr. Clarey, executive vice president and manager of defendant bank, that his wife had moved

out of the residence, was getting an order ejecting him, but the equipment would be left there and he wanted to farm it out with various studios so the real property could be rented. After consulting the bank's attorney, Mr. Clarey advised appellant that the equipment would be in precarious position if both spouses moved out and as it was collateral for the loan the bank must demand payment or work out some other plan, that such demand would mean foreclosure. Clarey told him later that Mr. Vernon P. Spencer, the bank's attorney, suggested that the property should be placed in safekeeping at some suitable place, remaining subject to the loan. Wade liked the idea, saying it had some merit. Later Bekins was suggested as place of storage and Wade said the plan was agreeable but it would take him a few days to pack and catalogue the items and to disconnect the machinery. June 1 was set by Clarey and Wade as the date for Bekins to pick up the property and put it in safekeeping. Before that date appellant wanted more time, and June 8th was agreed upon, appellant still being agreeable to storage rather than foreclosure. At his request another delay was agreed on and June 15th was fixed as the date of removal. On the 13th or 14th of June appellant told Clarey he would have everything ready by Saturday the 15th. Clarey had also talked to Mr. Milton Cohen who was acting as attorney for Mrs. Wade, and he had expressed satisfaction with the plan on behalf of Mrs. Wade.

On June 11th or 12th appellant called Mr. Spencer seeking further postponement of the date of removal, saying he was not ready; Spencer told him the loan had been in trouble almost since its making; that the bank could call the note and foreclose but if both Wades were willing it would forego immediate demand and move the property into safekeeping; "we are not going to stall around any more"; also, "you know that we have already contacted Bekins, you have agreed to it, and we just can't permit this thing to go on indefinitely." This was not the first discussion of the matter between them. Wade finally said, "if this is agreeable with Annie, this is what I want to do. Whatever she does is okay with me." Spencer also told appellant that the bank had cleared the safekeeping with Bekins and Wade said, "that's fine with me." Spencer said on one occasion that if the property was put in safekeeping that would give Wade "a better chance to conclude some of these deals that you have been talking about for a long while." Spencer testified: "There were

conversations about several deals, I was informed by Mr. Clarey, but nobody ever came up with any money, nobody came in and handed us a cashier's check for the amount of our loan or anything else.'' In one of the conservations between Clarey and Wade the latter said they, the Wades, wanted all the property stored except some furniture, and Clarey said ''Okay.''

On the evening of the 14th Clarey asked Spencer about getting a written consent and was told that it was not necessary, that he, Spencer, was satisfied Nick had consented, but it was okay with him if Clarey wanted one. So the attorney dictated it and told Clarey to get it signed if he could; ''I didn't think the writing was necessary and I was a little provoked that Mr. Clarey even suggested the necessity for it. I was so convinced that Mr. Wade was delighted with the opportunity which the bank had given him.'' Spencer also testified that it made no difference to him whether the parties refused to sign. The document, addressed to the bank and as later presented to the Wades, read: ''This letter is written to give your bank authority to take possession of the personal property, also known as chattels, given to your bank as security for our loan of $10,825.00, secured by chattel mortgage. You are further authorized to remove this property and place it in safekeeping storage with the Bekins Van and Storage Company at 3016 Wilshire Boulevard, Santa Monica, California.

''We further request your bank to accept from us such other personal property as may or may not be described in the chattel mortgage for storage and safekeeping as a matter of convenience to us. We understand that the costs of the packing, transferring and storing of these items will be advanced by your bank and ultimately charged as an advance on our loan with you. All of this is being requested without prejudice to any of the legal rights of the bank under the terms of this chattel mortgage.'' Spencer had told Wade he would have access to the property and Clarey told Spencer that he had said the same thing to appellant.

Mr. Milton M. Cohen, Mrs. Wade's attorney, testified that she claimed the residence, furniture and equipment to be her separate property; that she would probably try to rent the house; also that Mr. Wade's attorney in the divorce case said he was inclined to agree that her claim of title was correct.

On the morning of June 15 Mr. Aaron M. Hepokoski, representing the bank, and his cousin Otto W. Hepokoski, Jr.,

arrived at the Wade property about 9 to 9:30 a.m. The moving job was completed about 4:30 p.m. Appellant let the Hepokoskis in and said he had not packed or catalogued the property and needed an electronics engineer to disconnect the equipment. Hepokoski telephoned Clarey, who also talked with Wade and then told Hepokoski the matter was cleared. He heard Wade say to Clarey he would agree and would assist in disconnecting. Wade thereupon produced some empty cannisters to hold the films; Bekins' men packed them; Hepokoski borrowed Wade's typewriter and prepared tags for the various items. Wade showed them the plugs in which various tape recording and other machines were connected, explained their relation to each other and assisted in disconnecting. He also produced from number 18704 covers for the equipment. He never indicated to Hepokoski any objection to anything and was cordial in manner toward him and the movers. He directed them to number 18704 and a number of lighting fixtures and transformers which they tagged and placed on the truck. Hepokoski had a copy of the chattel mortgage and he used the schedule attached to it as Wade identified the items for him. Otto W. Hepokoski heard Wade on the telephone say he would cooperate, and saw Aaron and Wade inspecting machinery to see how it was attached, saw the two using Aaron's list in checking off the machinery to be placed on the truck. He said Wade did not yell at the workmen.

Mrs. Wade and Mr. Cohen arrived about 10 to 10:30. She signed some six copies of the written consent that Mr. Spencer had prepared, doing so after her attorney endorsed on it a reservation of the right to have enough furniture remain in the house to enable her to rent it. According to Hepokoski, Cohen asked appellant to sign and ''Wade told him that he wasn't going to sign anything because he was under the impression through the court and everything else that it was her property, that he didn't want anything to do with it unless he had an attorney there to read it.'' According to Cohen, Mrs. Wade said to appellant: ''What's the matter, Nick, why don't you sign it?'' And he replied: ''According to your claim it is all your property anyway; that's what you claim. You claim that you own it and I am just here as a spectator. I am watching what goes on but I am not signing anything; I am not going to do anything.'' Hepokoski had been told that it was not necessary to get signatures to the document if there was any objection, as ''this was already prearranged.'' So the identifying, tagging, loading and haul-

ing away of the mortgaged property (with the exception of certain furniture) proceeded to a conclusion without any objection or complaint on the part of appellant. Indeed, his first objection was voiced on the day of filing these actions, February 16, 1959, which was the same day on which the bank finally commenced an action to foreclose the chattel mortgage.

Such is the picture painted by the defense witnesses. The trial judge obviously believed them for he found that the taking was with appellant's express consent and therefore there was no conversion: "That it is true . . . that on June 15, 1957, with the knowledge, consent, agreement and cooperation of plaintiff, all of the personal property referred to and described in plaintiff's complaint was identified, packaged, removed and stored in Bekins Van and Storage warehouse in Santa Monica, California for safekeeping, subject to the lien of defendant for the payment of an indebtedness owing and unpaid by plaintiff to defendant."

Appellant gave a radically different version of the facts. He testified that he had no talk with Mr. Clarey or any other bank official about storing the mortgaged property with Bekins, or at all; that he did tell Clarey he would like to store the equipment in some studio while the wife had the house; that Clarey later told him Spencer had said the equipment, etc., would have to be stored and he, Wade, replied that that could not be done "as I have work to finish." When Bekins' men arrived on June 15th they asked if anybody from the bank was there and were told, "I don't expect anybody here from the bank. What do you want? The bank has nothing to do over here at our residence, unless you are coming over here to check the inventory." When Hepokoski arrived he presented the written consent for the bank to take the property into its possession and said he was instructed to take it to Bekins Van and Storage. Appellant told him he would not sign it, as "I have people coming that same day that I can lease the equipment, I must finish the films that I have." Hepokoski said: "We can take it with you, without you. I am here to take this equipment and that's all there is to it, and whatever else there is in the house." When the men started packing and moving things into the truck appellant told them, "I told these fellows, 'Look, you are doing things illegal. Nobody has instructed to do anything. I don't think Mr. Hepokoski has the authority. Get hold of some bank officials.' " Wade, so he says, told them not to disconnect the machines because they were hot; "the only reason I helped

them, because it hurt me the way he was disconnecting the machines and rewinding those coils, that it will be ruined. I did rewind some of the wires in order not to have part of that machine ruined completely. . . . I gave no permission whatsoever on this.'' Also: ''I said, 'I don't know what this is about. There was no such thing supposed to be, coming down here and taking any part of this equipment.' '' When Mrs. Wade and Cohen arrived, the attorney gave her the letter to sign and she said: '' 'You are doing it to me again.' . . . I said, 'Annie, I didn't write this letter; I didn't have anything to do with it.' '' Cohen took her into the kitchen and when they returned she had signed the authorization, Cohen having added a reservation concerning the furniture. Hepokoski told Bekins' men: '' 'Don't pay any attention to Mr. Wade.' He says, 'We own this equipment, everything is ours.' He says, 'We have our instructions. It is legal and proper.' He says, 'You boys just go ahead and take it.' . . . It was about 11:00, 11:15, and Mr. Cohen agreed with him it is perfectly legal and correct he should take it.'' When Cohen came up with the idea of storing the property, ''I said, 'Somebody must be out of their head. That equipment has to work to make money. If that equipment is put in storage for even a month or two months, it will deteriorate.' He says, 'Then you won't let us put it into storage?' I said, 'For God's sake, no, and I think if you had any brains at all you wouldn't even suggest it. If you want me to, I can lease it but I would rather finish the film that I am working on.' '' He further said that he gave no permission to anybody to remove any of the property listed in the chattel mortgage. Before June 26th Clarey had made no request for payment and had not threatened to demand payment unless appellant consented to storage of the equipment. He never had any conversation with Spencer concerning storing it and never had any intention of storage with anyone. He did not tell Spencer that if the bank and Annie wanted to have the property stored it was all right with him; or ''whatever is good for Annie is good for me.'' Nor did he tell Spencer that all of the property involved belonged to Mrs. Wade. He never talked to Spencer before June 15, 1957. ''Q. By Mr. McGinley: Then your frame of mind on June 15th with regard to possession of the property that we are talking about was that it was all to be left there where it was on June 15, 1957? A. That's right, to be left at the premises.''

The foregoing is, as previously indicated, appellant's version of the facts, one which the trial judge obviously rejected and for ample reasons.

The Wade divorce never became final and the parties were reconciled in March 1958. Mrs. Wade partially corroborated her husband's testimony. She said that when she arrived on June 15th appellant was talking to the movers and calling them a lot of names. She and he were both angry and arguing. He was shouting and yelling and calling "Shylock," was almost at the point of hysteria. She did not see him assist in packing or moving equipment.

By way of corroborating his own testimony through establishing circumstantially the state of his mind on June 15th—nonconsent—appellant testified without objection that he told Mr. Clarey in early May that he wanted to let Annie rent the house or move into it, and "the studio was ready now to move the equipment . . . to a place where I designed the studio and it was ready built for taking motion pictures and recordings up in it. It was called the Faber-Robinson Studio." Also: "I start explaining to him [Clarey] first that a studio is ready to put this equipment in where it really should be so we don't have to remove the equipment continuously. I have a person that wants to associate with me, put up a lot of money to build a studio, just wants my equipment, and we will go on a 50-50 basis no matter what the note or what I owed, he would pay my debt, and this I informed Mr. Clarey." The man's name was Fabor Robison.

Mr. Robison was called as a witness and counsel propounded to him four of the five questions which are the subjects of appellant's first assignment of error. He testified he was engaged in producing phonograph records, promoting new artists, producing television shows, was considered a talent scout. He had known appellant from 1955 when they were discussing production of television films and movie films. He knew Wade was in the television film production business in Malibu. They had spent considerable time in going over the films that he was working on.

 Question *One* and ruling thereon which was assigned as error: "Now, prior to June 15, 1957, did you enter into some *tentative* arrangement with Mr. Wade concerning the production of television shows? A. Yes, we did. Mr. Mc-GINLEY: Objected to as immaterial." (Emphasis added.) Plaintiff's counsel explained that the prospective evidence was corroborative of Wade's testimony "that an arrangement

existed between him and Mr. Wade whereby Mr. Fabor Robison had built a studio and that Mr. Wade *was negotiating* with him to shoot or to use the studio—it was in an advantageous location—for the purpose of operating the business and that *these negotiations* had practically been completed and that he told Mr. Fabor Robison certain things concerning that and Mr. Fabor Robison had *tentatively agreed* to take over the chattel mortgage on the equipment and that they would begin anew at this location, that this was the same thing that Mr. Wade had told Mr. Clarey at the bank. Mr. Fabor Robison was down at the house on the morning that the property was taken and he was down for that purpose and had been told by Mr. Wade that someone from the bank was coming there to inventory the equipment, which is also corroborative of what Mr. Wade had said since it is implicit here that this is a fabrication on the part of Mr. Wade. This evidence is material to his state of mind before the property was taken.'' (Emphasis added.) The court remarked that ''it seems to me that it is purely collateral and not directly involved with the issues. The objection is sustained. MR. STANLEY: May I make a further offer of proof, your Honor, that this testimony goes to Mr. Wade's state of mind before the property was taken and during the time that he was supposed to have been talking to Mr. Clarey about consenting to the property being taken?'' The court reiterated its ruling sustaining the objection. ''MR. STANLEY: I wish to make a further offer of proof for the record, your Honor. . . . [T]he further offer of proof is this, that it is inconsistent with Mr. Wade's state of mind being that of consent that he would have told someone else at the same time a statement which was inconsistent with the state of mind of consent, and for that purpose it is being offered.''

In passing, it is to be noted that counsel sought to elicit nothing more than a ''tentative arrangement,'' a ''pending negotiation'' which ''had practically been completed,'' that Robison had ''tentatively agreed to take over the chattel mortgage''—all of which things would have a tendency to put Mr. Wade in a frame of mind to delay enforcement of his debt as long as possible but would not warrant an inference that he would resist a reasonable demand of his creditor to the point of precipitating a replevin action and foreclosure through refusal to cooperate.

Question *Two.* After saying that he, Robison, had been at Wade's studio on the morning of June 15, he was asked:

"What was your occasion for going over there that morning?
A. Mr. Wade had called me the day before saying something about somebody coming to inspect the equipment or something. It wasn't too clear but anyway he wanted me to come over and I went." This answer was stricken except the statement that Wade had called him over. No offer of proof was made and the question was dropped. The ruling clearly was innocuous, whether right or wrong, and is a matter which need not delay us.

Question *Three.* Robison then testified that when he arrived "they were moving out the equipment. . . . I didn't know who," and that Wade met him in the street. "Q. By Mr. Stanley: Did you have a conversation with Mr. Wade as to what was going on? A. Yes, I did. Q. What did you say to Mr. Wade and what did he say to you?" Objection was sustained and without more ado the witness proceeded to testify that "[i]t seemed like everybody was working on the equipment. Q. By Mr. Stanley: Were you able to identify the persons that were there other than one being an attorney and the others moving the equipment out? A. I am not too sure. I couldn't identify them because really I didn't pay too much attention to who it was." However, the same question was asked again: "Mr. Stanley: I am going to ask this question again for the record, your Honor. Q. What did Mr. Wade say to you and what did you say to him at that time?" Objection was again sustained, and counsel for appellant then said: "This is the same offer of proof on Mr. Wade's state of mind at that time." That was the complete offer.

Question *Four.* The witness then said that *after* the 15th of June he called the bank for the purpose of making an inquiry about buying the equipment, talked to someone, probably Mr. Clarey. "The Court: To what particular issue are you directing this inquiry? Mr. Stanley: Your Honor, to the issue of consent in this, that Mr. Robison's testimony is that when he talked with Mr. Clarey he asked about the equipment." The witness continued, saying that he asked Clarey about buying the equipment and Clarey sent him a list of the same; Clarey said he owned it or the bank owned it; the witness conveyed to him the fact that he was interested in purchasing the equipment and talked to him two times; they negotiated the price of the stuff and what shape it was in. "Q. By Mr. Stanley: Did you build a studio, Mr. Robison, prior to the 15th of June in '57 for the purpose of accommodating the equipment that Mr. Wade had? A. Yes, we—

MR. McGINLEY: That is objected to as immaterial. THE COURT: What is the materiality of that to the issues in the case that we are now trying, the issue of liability which we discussed in chambers? MR. STANLEY: It goes to the same thing, your Honor. THE COURT: To what does it go? MR. STANLEY: To the state of mind of Mr. Wade.'' It should be noted that in fact counsel here shifted to the mental state of Robison rather than that of Wade, and also to a mere uncompleted negotiation.

Question *Five* was propounded to Harold Leroy Powell, president of a corporation which designed, developed and manufactured magnetic sound recording equipment for motion picture productions. He said he had known Wade since the latter part of 1954, he having made purchases from the witness' company; that the witness serviced the equipment and went to the Malibu studio on numerous occasions. ''Q. BY MR. STANLEY: Now, shortly before the 15th of June, 1957, did you have a piece of this equipment that was normally located down at the Malibu studio? A. Yes.'' Upon inquiry by the trial judge, counsel for appellant indicated that by ''shortly before'' he meant ''approximately two days before,'' and asked the question again. The witness said: ''Yes, I did,'' and the court granted a motion to strike. The claim of materiality, as advanced by plaintiff's attorney, was that Powell was called to bring the piece of equipment back because ''the bank was making an inventory of it'' and that he could pick it up the following day.

The court orally summarized the facts and law at the close of the case and resumed the matter on the following morning, at which time allowance of attorney fees was disposed of and the judge said: ''There is one thing that I didn't state yesterday, at least I have no recollection of stating it, and that was in connection with the testimony offered through the witness Robison. He was the one who was asked whether or not he had any prospective transactions with Mr. Wade in regard to the use of the films and the equipment, and I sustained an objection to that and also to the offer of proof. I want to make this clear, that even had that testimony been admitted, it would not have affected my decision with respect to there having been a consent given by both Mr. Wade and Mrs. Wade. That would not have changed my opinion at all because I am quite sure that Mr. Wade did have in mind use of the film and the use of the equipment, but due to the climate that existed on June 15, 1957, where he was under a

restraint and Mrs. Wade had no opportunity to engage in any business in which the films and the equipment could be used, it was their intention that this equipment and all connected with it should be stored for the protection of both parties, and that's my feeling in the matter. As I say, that evidence would not have changed my opinion.''

The more important aspect of this proffered evidence, assuming that it goes to the state of Wade's mind and that that was an issue in the case, is its palpable limitation to a subjective state of mind—nonconsent to the taking of the goods to storage. ■ Plainly, an esoteric nonconsent is of no consequence in a conversion action such as this one where the owner is present at the time of taking; it must be shown by objective, not merely subjective evidence, or there is no nonconsent. ■ True, the matter of consent like most any other issue is susceptible of proof by circumstantial evidence, but such evidence does not rise to the quality of proof unless it pertains to something done or said by Mr. Wade showing his nonconsent.

In *Butler* v. *Collins,* 12 Cal. 457, a conversion case, the court said, at page 463: ''It is said that the owner consented to the taking; and, were that so, it would undoubtedly be a sufficient answer. But consent, in law, is more than a mere formal act of the mind.'' ■ This language was repeated in *Heine* v. *Wright,* 76 Cal.App. 338, 343 [244 P. 955]. *People* v. *Dong Pok Yip,* 164 Cal. 143, 147 [127 P. 1031] : '' 'Consent, in law, means a voluntary agreement by a person in the possession and exercise of sufficient mentality to make an intelligent choice, to do something proposed by another. ■ ''Consent'' differs very materially from ''assent.'' The former implies some positive action and always involves submission. The latter means mere passivity or submission, which does not include consent.' '' ■ Bouvier's Law Dictionary (Rawle's Third Rev.), page 611: ''*Express consent* is that directly given, either *viva voce* or in writing. ■ *Implied consent* is that manifested by signs, actions, or facts, or by inaction or silence, from which arises an inference that the consent has been given.''

■ So far as can be ascertained from the record, the answers to the questions under consideration (which were supported by no offers of proof except the general assertion that they bore upon the state of appellant's mind), could not go further than to show an undisclosed intent in Wade's mind to refuse to consent; they could not in any way tend to prove

expression of nonconsent by him either in words or by conduct at the time of the taking. ▉ If he had in fact protested or stated he would not consent, proof of that fact would also connote an existing intent such as his counsel suggests, and no circumstantial evidence upon the precise point would be of the slightest assistance.

▉ Obviously, these questions called for proof of collateral facts and had no other tendency than confusion of issues and waste of judicial time. That kind of proof, direct or indirect, had no place in the record. ▉ *People* v. *Lynch*, 122 Cal. 501, 503 [55 P. 248]: "Testimony must be confined to the issues. Evidence of collateral facts are [*sic*] excluded under the rule as being incapable of affording any reasonable presumption or inference as to the principle [*sic*] fact or matter in dispute. (1 Greenleaf on Evidence, §§ 51, 52.)" ▉ *Henry* v. *Southern Pac. R. R. Co.*, 50 Cal. 176, 185: "The admission or rejection of such evidence may resolve itself into a question of policy and expediency dependent upon the pressing necessity of resorting to circumstantial evidence in cases in which direct evidence is not ordinarily to be had." ▉ *Sanders* v. *Austin*, 180 Cal. 664, 666 [182 P. 449]: "It may be that testimony as to what the plaintiff paid for the machine was not competent and that if it had been objected to the objection would have been good. Such objection would have been good, however, not because such testimony was of no probative value, but because, standing alone, it was of slight probative value only, and to make it more than this would involve an inquiry into a collateral question, namely, whether or not the plaintiff had paid too much for the car. The rule is that testimony involving a collateral issue will not be permitted where such inquiry, in its probative bearing on the main issues, will not be worth the time and necessary complication of issues involved."[1]

---

[1]Wigmore on Evidence (3d ed.) § 38, page 428: "It has just been seen (§ 31) that the general and broad requirement for Relevancy is that the claimed conclusion from the offered fact must be a possible or a probable or a more probable hypothesis, with reference to the possibility of other hypotheses. This is not only the general principle that best describes the attitude of the Courts, but is also the expressed form of the test for specific kinds of facts."

*Id.*, section 39, page 431: "The term 'collateral', sometimes here employed, has two senses, and is apt to mislead unless they are discriminated. (1) The original and dominant sense of 'collateral' as here applied (its application to the impeachment of witnesses—*post*, § 1021—being a totally different one) is that of '*immaterial.*' (2) But occasionally the term was used to signify '*remotely probative*', or 'indirectly

In this case there was no lack of direct evidence upon the crucial issue—whether there was an objective nonconsent shown by appellant. Messrs. Clarey, Hepokoski, Hepokoski, Jr., Mr. Wade, Mrs. Wade, and Mr. Cohen, covered the subject fully. There was no paucity of testimony upon the exact question of consent shown by speech or conduct. To pursue these questions and more like them with Robison and Powell certainly would not disclose such probative bearing upon the main issue as to be "worth the time and necessary complication of issues involved." When we add to this the absence of any informative offers of proof we cannot say that there was any error in sustaining the objections now under review. "The relevancy or remoteness of evidence offered is mainly within the discretion of the trial court." (*Zollars* v. *Barber*, 140 Cal.App.2d 502, 509 [295 P.2d 561].) Witkin on California Evidence, section 112, page 134, quoting Uniform Rules of Evidence: " 'Obviously the judge should have some discretion to prevent the trial from going off on tangents of relative unimportance. . . . It is a rule of necessity. Its sanction cannot be escaped if we are to have orderly and efficient trial procedure.' "

Appellant's second point is that the written authorization given by the bank to Bekins mentioned only 18708 Topanga Beach Road and hence any taking from 18704 was not authorized. The two addresses were side by side, consisting of a residence and a communicating studio. Some of the mortgaged property was at one address and some at the other. Hepokoski who had signed the authorization for the bank was present all day and assisted in preparing and attaching tags and markers to property from 18708 and 18704. After disconnecting certain machinery appellant went to 18704 and there procured certain covers which he brought

connected', *i.e.* directed to prove a proposition in issue, and yet possessing for that purpose a weak quality of relevancy; thus the fact might be possibly relevant, if a close enough connection and a real probative value should appear."

*Id.*, section 39, page 432: "The practical difference between these two senses was that in the former sense the fact was always and clearly inadmissible, while in the latter sense it might become admissible under some circumstances. A fact might thus deserve different fates, according as it was 'collateral' in one or the other sense. . . .

"What is needed, therefore, is simply a mutual understanding of the sense in which the term is being used on a particular occasion. When it is used in the second sense to express remoteness of probative value, the fact in question may or may not be admissible, according to the standard judicially declared in § 38, *ante*; there is nothing decisive in its 'collateralness.' ''

back and placed upon those articles. When Hepokoski and his cousin and the Bekins men returned from lunch appellant directed them to 18704 and a number of lighting fixtures and transformers there located, which were tagged and put on the Bekins truck. Hepokoski referred to the "studio portion of the home" No. 18708, and "the home next door, which I believe was numbered as 18704." Appellant testified that all the property on the exhibit to the complaint (the mortgaged property) was located in both houses and he was in possession of it and no one else was residing at either address. He referred to 18708 as the dark room and editing room. The complaint in the action against Bekins alleges that the conversion occurred at No. 18704, while plaintiff's pretrial statement says it was at 18708. The fair inference is that 18704 and 18708 were used together as a single studio and residence. Certainly the oral agreement for storage embraced mortgaged property situated at both addresses. A written order was not necessary and, of course, the bank's subsequent ratification of what its agent had done was the equivalent of original authorization. The point now pressed was not made at the trial and we find no merit in it.

Lastly, appellant claims that his consent was procured by fraudulent representations; his attorney argues that Mr. Spencer had represented to Wade that he would be granted access to the property when taken for safekeeping and that the written order in favor of Bekins excluded plaintiff from the list of persons entitled to have access, and this was a fraud.

Clarey testified that Wade asked if he could go up to Bekins and inspect the property and he told Wade he could; that was part of the original arrangement and Bekins had been so instructed. Spencer testified: "I told him he would have access to the property and Mr. Clarey told me that he had told Mr. Wade that he would have access to the property. And I can tell you if Mr. Wade wanted access, if he didn't get it, there was only one reason. It wasn't the bank's fault. Mr. Wade wasn't willing to pay the service charge of Bekins Van & Storage and that's the only reason as far as the bank is concerned." "You don't know if Mr. Wade was at Bekins Van & Storage after the 15th of June? A. No, but I know he made a request and I know because we advised him he could go and he never went and at the time we advised him that he could have access we said he would have to pay

the charges." The court found there was no false representation and certainly was justified in so doing.

Appellant in support of this argument relies upon the terms of the Bekins "Order for Service" which contains these words: "Account subject to access for George Cohen, Jr. or Ann Dvorak Wade for Inspection only." Obviously the words "for Inspection only" limit the purpose of access of the named individuals and do not say in substance or effect that Mr. Wade should have no access. Clarey and Spencer both told him he would be subject only to payment of Bekins' handling charges. There is no showing whatever that either of these men intended not to perform their promise at the time of giving that assurance, and hence there is no proof of fraud. No writing on the subject was necessary and the parol evidence rule does not apply for or against third persons. ▆▆▆ Neither complaint alleges fraud nor is such an issue mentioned in the pretrial order or statements. This contention cannot be sustained.

An examination of the entire record in these cases discloses that there has been no miscarriage of justice here.

The judgments are affirmed and the attempted appeals from order denying new trial are dismissed.

Fox, P. J., and Herndon, J., concurred.