470 F.2d 1259
 152 U.S.App.D.C. 350
 Walter A. WEISS
v.
KAY JEWELRY STORES, INC., et al., Cecil D. Kaufmann and
Simon Hirshman, Appellants.
Walter A. WEISS
v.
KAY JEWELRY STORES, INC., Joel S. Kaufmann, Appellant, Cecil
D. Kaufmann et al.
 Nos. 24443, 24444.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 27, 1972.
Decided Nov. 3, 1972.
 
 1
 Mr. Hugh B. Cox, Washington, D. C., with whom Mr. Michael Boudin, Washington, D. C., was on the brief, for appellants in No. 24443.
 
 
 2
 Mr. Francis M. Shea, Washington, D. C., with whom Messrs. Martin J. Flynn and Anthony A. Lapham, Washington, D. C., were on the brief, for appellant in No. 24444.
 
 
 3
 Mr. Joseph Forer, Washington, D. C., with whom Mr. David Rein, Washington, D. C., was on the brief, for appellee, Walter Weiss.
 
 
 4
 Mr. James R. Stoner, Washington, D. C., entered an appearance for appellees, Kay Jewelry Stores, Inc., and others.
 
 
 5
 Before MacKINNON and ROBB, Circuit Judges, and MATTHEWS,* Senior Judge, United States District Court for the District of Columbia.
 
 MATTHEWS, Senior District Judge:
 
 6
 A stockholder's derivative action was filed in the United States District Court for the District of Columbia by Walter A. Weiss (Weiss), a stockholder of Kay Jewelry Stores, Inc. (Kay), a Delaware corporation. From a summary judgment entered against them jointly and severally, the defendants Cecil D. Kaufmann (Cecil), Joel S. Kaufmann (Joel), and Simon Hirshman (Hirshman), president, treasurer and secretary, respectively, of Kay, and directors thereof, appeal.[1] The question on this appeal is the propriety or merit of the grant of summary judgment.
 
 
 7
 The controversy here centers around shares of stock of 39 of Kay's subsidiary corporations and three of Kay's affiliated corporations which Joel sold to Kay after Joel had previously acquired them at a judicial auction.[2]
 
 
 8
 In the complaint it is charged that Joel, with the prior knowledge of the other defendants, bought the subsidiary shares at auction "in accordance with an arrangement among the individual defendants" that Joel would later "resell the shares to [Kay] at a price higher than he would pay at the public sale"; that thereafter Kay's board of directors authorized the purchase of the shares from Joel at a price including Joel's "acquisition cost"; that the board knew that such cost was not properly to be included because of embracing large expenses incurred by Joel in contesting the will of his brother Robert "which contest was for the personal benefit and interest of Joel"; and that by these actions the individual defendants breached their fiduciary obligations as directors of Kay, and enabled Joel "to profit personally at the expense of the company."
 
 
 9
 A judgment was sought for $191,870.26, being the difference between the cost to Joel of the subsidiary shares at the auction ($205,330.03) and the price paid to him by Kay ($397,200.29).
 
 
 10
 While conceding in their answers the purchase of the stock by Joel at the auction and its subsequent sale to Kay, the defendants denied that there was any pre-auction arrangement or agreement that Joel would resell the stock to Kay. They averred that prior to the auction Kay's board of directors discussed the securities to be offered thereat and authorized negotiation for the purchase from Joel of the sudsidiary shares should he acquire them, and that these discussions contemplated that if any such purchase eventuated the price would be measured by the cost of the shares to Joel and "some fair share" of the expenses incurred by him in the litigation which resulted in the sale of such securities. Responding to the allegation in the complaint that the shares had a book value of $469,653.00, defendants asserted that their book value was $490,420.67. The defendants denied that the will contest "was for the personal benefit and interest of Joel" and that Joel was enabled "to profit personally at the expense of the company." Moreover, the defendants denied any breach of their fiduciary obligations to Kay and its stockholders.
 
 
 11
 Immediately following oral argument for and against the motion of Weiss for summary judgment the court expressed its views as follows:
 
 
 12
 "While on some of the Plaintiff's theories in this case, there may be disputes, genuine disputes of issues of fact, the Court holds that there is no * * * genuine dispute of any issue of fact involving this question, and that is that the purchase by Joel S. Kaufman of the stock in question and its resale to Kay's was a scheme devised by the Defendants to reimburse Joel S. Kaufman for his personal expenses in a will contest unconnected with the corporate business of the case; that such on the part of the Defendants was a gross violation of their duties to the corporation and to the stockholders, and that the corporation is entitled to recover the excess price, and I'll grant summary judgment." Transcript of Proceedings, April 30, 1970, p. 47.
 
 
 13
 * A summary judgment is authorized only if "there is no genuine issue as to any material fact and * * * the moving party is entitled to a judgment as a matter of law."[3] The function of the court on a summary judgment motion "is limited to ascertaining whether any factual issue pertinent to the controversy exists; it does not extend to resolution of any such issue."[4] Once it is determined that material facts are in dispute "summary judgment may not be granted," and in "making this determination doubts * * * are to be resolved against the granting of summary judgment."[5] To warrant summary judgment the record "should show the right of the [movant] to a judgment with such clarity as to leave no room for controversy, and * * * should show affirmatively that the [adverse party] would not be entitled to [prevail] under any discernible circumstances. * * * A summary judgment is an extreme remedy, and, under the rule, should be awarded only when the truth is quite clear."[6]
 
 
 14
 On appeal from a summary judgment entered by the District Court on pleadings, depositions, affidavits and other evidentiary papers, this court as the reviewing tribunal must give to the parties against whom the summary judgment was entered the most favorable view of the record.[7] So viewed, we perceive genuine issues of material fact over the motive and intent of Joel in buying the shares and in later selling them to Kay, the motivation of Cecil and Hirshman in any action taken by either or both of them in respect of the two above-mentioned transactions, and whether the defendants or any of them devised a scheme, including such transactions, for the purpose of reimbursing Joel for his personal expenses in a will contest unconnected with the corporate business of Kay.
 
 
 15
 Questions of material fact are also involved (1) in the claim of Joel that he bought the shares in his individual capacity in a non-corporate matter and, as an incident of his private ownership, had the right to name the price at which he would sell; and (2) in the claim of Cecil and Hirshman that in the absence of a factual finding that they acted in bad faith the law presumes that as directors they exercised good faith.
 
 
 16
 Accordingly we hold that the defendants are entitled to have the factual issues resolved by a trial on the merits.
 
 
 17
 As there are many background facts without substantial controversy, we relate them as they may serve to elucidate the legal problems presented when later we reach them for discussion.
 
 II
 
 18
 The Will Contest: The shares of stock involved in this case were a part of the estate of Robert D. Kaufmann, unmarried brother of Joel and a cousin of Cecil, who died in 1959 while domiciled in New York. Joel and his invalid brother, Aron, were Robert's nearest blood relatives and would have been entitled to Robert's estate had he died intestate.[8]
 
 
 19
 Three wills were left by Robert. In his earliest will Robert gave his estate in the main to his brother Aron and to Joel's two minor sons. The next to the last will was one in which Robert gave his residual estate, including the shares in this litigation, half to Joel's two minor sons and half to Weiss. The purported last will of Robert gave virtually his entire estate to Weiss, including such shares, and named Weiss sole executor.
 
 
 20
 Believing that Weiss had procured the purported last will by exercising undue influence over Robert, Joel contested the will, and litigation ensued covering a span of almost six years. Two juries found that Weiss had exercised undue influence over Robert, and the will leaving virtually all of Robert's estate to Weiss was denied probate.[9] Thus the will next in line for consideration for probate was the one giving the residual estate half to Weiss and half to Joel's two minor sons. The total litigation expenses incurred by Joel in the will contest up to that point, as later determined by a committee appointed to report on the matter to Kay's board of directors, were $284,838.28.
 
 
 21
 Auction of Stock Ordered: Litigation over the estate continued.[10] Funds being needed to meet administration expenses and estate obligations, the temporary administrator of Robert's estate obtained a court order authorizing the sale at public auction of the stock held by the estate. The court fixed a minimum price that the administrator was authorized to accept, and in the aggregate it was $299,388. However, the court was careful to point out that such minimum price was not an appraisal or determination of the market value of the shares.
 
 
 22
 Intending to bid on these securities, and aware that Weiss was claiming the shares were worth at least $500,000 and was trying to get bidders or to get financing for a bid of his own, Joel arranged financing at a bank up to $500,000 for his own bid, and did so on his individual credit and that of his brother Aron, no assets of Kay being involved.
 
 
 23
 Circumstances Preceding Auction: Joel made known to Cecil and Hirshman his intention to bid at the auction. He stated that if he had competition he intended to bid the price up to cover his litigation expenses. Sometime prior to the auction Joel told Cecil that if he acquired the shares he would be willing to sell them to Kay at what he deemed his true cost-i. e., the purchase price at the auction plus the expenses of the litigation. Cecil "felt that it would be to the company's interest and the stockholders' protection" if Kay owned the subsidiary shares but that Kay would not want the non-subsidiary shares.
 
 
 24
 Cecil indicated to Joel that while he could make no arrangement or commitment in the matter, he would recommend to Kay's board of directors that Kay purchase any subsidiary shares acquired by Joel at the auction at Joel's asking price so long as that price did not exceed book value-that is, the sum paid for the subsidiary shares at the auction, plus the portion of Joel's litigation expenses allocable to those shares, subject to an upper limit defined by the book value of the shares.
 
 
 25
 The question of whether Kay itself should bid at the auction was also explored. Despite Kay's interest in acquiring the shares it was the judgment of Kay's president that Kay should not bid. His reasoning against Kay's entry into the bidding was along these lines: An indication of interest by Kay might cause a sharp rise in the price. It was not clear that the subsidiary shares would be auctioned separately from the shares Kay did not desire. Under an outstanding loan agreement of Five Million Dollars between Kay and an insurance company Kay could purchase securities of corporations other than its own subsidiaries only to the amount of $350,000. A breach of this agreement would make the loan payable on demand instead of 16 years hence. At the time of the auction such purchasing authority had been exercised to the extent of about $112,000. It was, of course, unknown prior to the auction what sum would be required to buy the shares. Since Weiss was attempting to secure bidders and to enhance the price and Joel had declared his intention, in the event of competition, to raise his bid sufficiently to cover his litigation expenses, it might well increase the cost of the shares to Kay should Kay enter into competitive bidding.
 
 
 26
 The possibility of acquiring the subsidiary shares should Joel obtain them at the auction was reported to Kay's board of directors on January 25, 1966, by Cecil. He also reported on other, unrelated, prospective purchases of minority stock interests in subsidiaries of Kay. He explained that Joel's terms would be the purchase price at the public auction plus an allocable portion of the litigation expenses leading up to the auction. He recommended acceptance of those terms so long as the total price to Kay did not exceed the book value of the shares. Every director was familiar with the litigation over Robert's estate and with the securities which the estate held. The board voted to authorize Cecil to "negotiate for the purchase of such minority interests as he deems desirable and advisable on such terms and conditions as, in his judgment, might be advantageous to this company." However, he was not to make any agreement binding on Kay without prior approval of the board. This was the situation when the auction occurred on June 7, 1966.
 
 
 27
 The Auction: Joel was the sole bidder and bought the shares for $299,388, the minimum price the administrator was authorized to accept. Of that sum, $205,330.03 was allocable to the subsidiary shares.
 
 
 28
 Sale of Shares to Kay: The board of directors of Kay met on July 1, 1966, and with Joel and Cecil not voting, approved the purchase from Joel of the subsidiary shares of stock he had acquired at the auction, the exact amount to be determined upon verification of the cost at the auction to Joel and audit of the expenses Joel had incurred.
 
 
 29
 At a later meeting of the board of directors a committee appointed by the president made a report to the board that the book value of the stocks in the 42 subsidiaries was $490,420.66. The cost to Joel at the auction was found to be $205,330.03, or 68.6 percent of the purchase price of all the securities he bought there. The committee further ascertained that Joel's total expenses in the litigation leading up to the sale were $284,838.28. Hence it added 68.8 percent of that figure to the auction price of the subsidiary shares to reach a total cost to Kay. Due to subsequent adjustments, however, the figure was reduced to a final price of $397,200.29. The board ratified its previous action authorizing Kay to acquire the shares, but neither Joel nor Cecil voted.
 
 III
 
 30
 The scheme finding[11] on which the District Court rested summary judgment stems from the motivation which the court imputed to Joel, Cecil and Hirshman.
 
 
 31
 We turn to the evidentiary materials which were before the District Court when summary judgment was entered. The averments in the complaint as to improper action and motivation were denied in the answers thereto, and as we earlier set forth the allegations of the pleadings we do not here restate them. The sole affidavit filed by Weiss dealt exclusively with establishing his status as a stockholder. He answered a few interrogatories propounded by defendants. His answers concerned only (1) his efforts to postpone the auction and to obtain bidders thereat and (2) the amount of money the court required of him to settle with Robert's estate for his misuse and misappropriation of estate assets prior to his removal as temporary administrator. Various documents were before the court as exhibits which had been produced by the defendants either on their own initiative or at the request of Weiss. Although dealing with aspects of the case, these documents in themselves do not treat of the motive, intent or purpose of the defendants. The mentioned documents include such papers as minutes of Kay's board of directors, memorandums touching on Joel's expenses in the will contest and in buying the shares, a list of the payments Kay made to Joel in its purchase of the stock, the loan agreement between Kay and an insurance company, and a copy of the provision in Kay's certificate of incorporation whereby a director may be a party to a contract or transaction with his corporation. All the defendants were deposed by Weiss and in addition filed affidavits explaining why and for what purpose they acted in respect of the transactions involved. The only direct evidence as to the motive, intent and purpose of the defendants was supplied by the defendants themselves and contravened the claims of Weiss as to such matters.
 
 
 32
 In a trial on the merits, if conflicting inferences may reasonably be drawn from underlying facts and circumstances in evidence, the trier of the facts, whether judge or jury, may make a choice of the inferences. But as the Supreme Court said in United States v. Diebold, Inc.:[12] "On summary judgment the inferences to be drawn from the underlying facts contained in such materials [affidavits, depositions, and attached exhibits] must be viewed in the light most favorable to the party opposing the motion." (Emphasis supplied.) A study of the record in this light leads us to believe that an inference contrary to the one drawn by the District Court may be permissible, and had it been drawn according to the teaching of Diebold, it would have precluded summary judgment.
 
 
 33
 Notwithstanding the District Court's scheme finding, we are required on this appeal from the summary judgment to read as true the version of the facts given by the parties against whom the judgment was entered.[13]
 
 
 34
 Joel by affidavit articulated his motivation in buying the shares.13a He explained that it was his intention "to bid on the shares being offered" at the auction "regardless of whether or not Kay would subsequently buy [from him] some of these shares", that "[o]ne of [his] objectives in undertaking the will contest litigation in the first place was to keep Robert's shares in Kay's subsidiaries and affiliates and in other companies" in which he was interested "out of the hands of Weiss", such other companies being family corporations under Joel's management, including but not limited to the Kaufmann Company, Kaufmann Furniture Company, and Swope Realty.[14]
 
 
 35
 As the reason for wanting to keep the mentioned shares out of the hands of Weiss, Joel stated in his affidavit that he regarded Weiss "as a serious trouble maker and threat to the sound operations of these companies."14a He further asserted that if he "did not bid at the sale" he believed "that Weiss or persons with whom Weiss was associated might well acquire the stock, thereby achieving what [he] had set out to prevent in the will contest litigation itself."14b
 
 
 36
 Assuming arguendo that the reason for Joel's purchase of the stock was as he stated-to keep it out of the hands of Weiss because he believed Weiss to be "a threat to the sound operations of these companies", certainly there is adequate evidentiary material to constitute reasonable grounds for such a belief.[15]
 
 
 37
 We think the evidentiary materials before the District Court raised genuine issues of material fact as to the motivation of the defendants and as to the existence of the alleged pre-arrangement or scheme.
 
 IV
 
 38
 Irrespective of the "scheme" finding on which the District Court based summary judgment, Weiss argues that the judgment is supportable on the ground of a showing in the record that the board of directors of Kay authorized the purchase of the stock "at a price far in excess of its worth."
 
 
 39
 We do not read the record as making such a showing. Our search reveals nothing to establish whether the price Kay paid ($397,200.29) was at or below or above the fair market value of the shares. The cost of the shares to Joel at the public auction was disclosed, but ordinarily prices realized at forced sales do not reflect fair market values. This is especially so when, as here, property is knocked down to a lone bidder. The shares are not listed on any stock exchange. The record shows that the book value of the shares was $490,420.67. However, book value may or may not be the measure of their worth. It is clear from the record that Weiss had charge of the affairs of Robert Kaufmann for ten years prior to Robert's death, and that when Weiss appeared before the Surrogate Court of New York County relative to the value of the shares after Robert's death, he insisted that the shares "should be appraised at least at full book value."[16]
 
 
 40
 We find the record inconclusive as to the value of the shares,[17] and we reject, as did the District Court,[18] Weiss' excess price hypothesis as justification for summary judgment.
 
 
 41
 Another ground for upholding the summary judgment, says Weiss, is that the record shows that no corporate purpose was served by Kay's acquisition of the shares.
 
 
 42
 Again we do not find in the record the claimed evidentiary showing. The contention of Weiss as to the absence of a legitimate motive for Kay's purchase was supported only by arguments and not as provided in the summary judgment rule.[19] The arguments are contained in two memorandums in support of the summary judgment motion. These memorandums were signed only by counsel, were not in affidavit form, and hence were not properly to be weighed, so far as their factual statements are concerned, in determining whether summary judgment should be granted.[20]
 
 
 43
 On the other hand, when Kay's president was deposed, he stated unequivocally that Kay wanted the subsidiary shares for a number of reasons, and that their acquisition by Kay was definitely in the interest of the corporation. He had served Kay as president since Kay's organization and, in addition, was a substantial Kay stockholder.
 
 
 44
 The record shows that exclusive of the stock involved in this controversy Kay owns eighty percent of the shares of each of its subsidiary corporations, and from time to time has acquired minority interests in such subsidiaries. These circumstances in themselves would seem inevitably to lead to a conclusion that there was a corporate purpose in Kay's acquisition from Joel of the subsidiary shares.[21] However that may be, we find no merit whatever in the claim that without dispute the record shows that no corporate purpose was served by Kay's acquisition. The question of corporate purpose in the acquisition is seriously contested, and may not be swept under the rug by a summary judgment.
 
 V
 
 45
 Now we take cognizance of the genuine issue of material fact interposed by Joel in his defense.
 
 
 46
 He claimed that he purchased the shares in his individual capacity in a non-corporate matter lying outside the field of his duties as a director of Kay. In other words, he maintained that in the purchase he was not acting as a representative of Kay and was not under any duty to do so. Therefore, he says, he validly acquired the shares in his own right, and, as the fruit of his ownership, was entitled to name the price which would induce him to sell.
 
 
 47
 According to 3 Fletcher, Cyclopedia of the Law of Private Corporations (1965) Sec. 950:
 
 
 48
 "Ordinarily, a director or other corporate officer may sell his property to the corporation if the sale is open and fair, and the corporation is represented in the transaction by other competent and authorized officers or agents."
 
 
 49
 Kay, being a Delaware corporation, the fiduciary obligations of its officers and directors are to be determined upon the ascertainment and proper application of the law of Delaware.[22]
 
 
 50
 As to interested director transactions, the Delaware law in 1967 was codified in Sec. 144(a) of the Delaware corporation law. Although effective after the transactions involved in this case, Sec. 144(a) seems only to have codified the pre-existing common law in effect in Delaware.[23] In substance Sec. 144(a) provides that no contract or transaction is void or voidable solely by reason of being between a corporation and one of its directors if the material facts as to the interest of the director and as to the contract or transaction are disclosed or are known to the board of directors and the board in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, or the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board.23a
 
 
 51
 The basis of the contention of Weiss that Joel breached his fiduciary duty to Kay is not entirely clear. In his initial memorandum in support of his motion for summary judgment, Weiss gave the impression that he was charging that in buying the shares at the auction Joel had seized and appropriated a corporate opportunity which belonged to Kay.[24]
 
 
 52
 However, in his fina memorandum in District Court and on this appeal, Weiss disavowed claiming that Joel had diverted to himself a corporate opportunity.
 
 
 53
 In the complaint, as already stated, the alleged breach of fiduciary duty by Joel was pitched on the premise that he bought the shares pursuant to a previous arrangement with the other defendants that he would later resell the shares to Kay "at a price higher than he would pay at the public sale"-a premise disputed by Joel, and contrary to the exposition given by him of his motivation.
 
 
 54
 Notwithstanding Weiss' disavowal of a claim that Joel misappropriated a corporate opportunity, his disavowal seems more imaginary than real. This is because, while he ostensibly recognizes that Joel was acting in a noncorporate matter in his purchase of the shares, Weiss hinges his claim of a breach of fiduciary duty by Joel on an assertion that Joel violated a "purchase-for-resale" rule-although if there is such a rule it seems to come into play only where a corporate officer, acting for his corporation, or under a duty to do so, secretly acquires for himself property which it was his obligation to obtain for his corporation and then passes the property to it at a higher price, or otherwise wrongfully seizes or diverts to himself assets or opportunities belonging to his corporation.
 
 
 55
 The defendants insist that there is no "purchase-for-resale" rule but if there is, they say, it is not applicable where, as here, the purchaser did not act as the representative of the corporation in respect of the particular purchase, and was under no duty to do so.[25]
 
 
 56
 The question before us on this appeal being the propriety of the summary judgment, we need not decide whether there is a "purchase-for-resale" rule, and we do not do so. The rules of law to be applied in this case necessarily depend upon the findings of fact to be made after the evidence has been adduced at trial.
 
 
 57
 We note, however, that the precedents cited by Weiss for the "purchase-for-resale" rule are not cases where the purchasers acted in non-corporate matters but, on the contrary, involve situations where corporate officers, acting as such or under a duty so to do, wrongfully seized for themselves funds or opportunities belonging to their corporations as in Marcus v. Otis, 168 F.2d 649 (2nd Cir. 1948); Central Ry. Signal Co. v. Longden, 194 F.2d 310 (7th Cir. 1952); Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A. 2d 503 (1939); and Norte & Co. v. Huffines, 304 F.Supp. 1096 (S.D.N.Y.1968), aff'd in part 416 F.2d 1189 (2nd Cir. 1969).
 
 
 58
 For example, in Marcus v. Otis, supra, corporate directors took funds of their corporation and bought for themselves shares in another corporation with the result that the corporation whose funds had been wrongfully abstracted was permitted by the court to follow and reclaim its funds or such property as was purchased therewith. In the instant case, Joel took no funds of his corporation but used his own money, in the will contest about $285,000, and in the purchase of the stock at auction, sums borrowed by him exclusively on his own credit and that of his brother Aron.
 
 
 59
 As a further example, in Central Ry. Signal Co. v. Longden, supra, the corporation, having an opportunity to enter into a contract with the Navy for manufacturing ammunition, sent Longden, one of its officers, to approach the government with that purpose in mind. Instead of procuring the contract for his corporation as was his duty, Longden seized the opportunity for himself, organized a separate corporation to take the contract, meanwhile concealing the true facts from the first corporation, making extensive use of its facilities and employees, and misleading the Navy into thinking that the new corporation had been formed by the first corporation to handle the contract and that the Navy would have the benefit of the prestige, experience and credit of the first corporation. Because of Longden's diversion of the corporate opportunity of the first corporation, his failure to disclose to it the true facts, and his use of its facilities, the court held that it was entitled to the earnings of the new corporation set up by Longden.
 
 
 60
 Unlike Longden, Joel was not sent on a mission by his corporation. He went on one of his own. Because of his close blood relationship to Robert, Joel had standing which his corporation did not have to contest Robert's purported last will. But for Joel's contest of that will, the shares would all have been in the ownership of Weiss. Longden concealed his seizure for himself of the naval contract which he was sent to obtain for his corporation. Joel made known to Kay his activities in respect of the will contest and the auction and Kay knew that Joel was acting for himself and not as its representative.[26] Longden used the facilities of his corporation but Joel used his own funds and did not involve Kay's facilities.
 
 
 61
 In none of the cases cited by Weiss are the facts and circumstances comparable to those of the case under consideration.
 
 
 62
 The Delaware cases have laid down the question to be resolved in determining the applicability of the corporate opportunity doctrine. It is "whether or not the director has appropriated something for himself that, in all fairness, should belong to his corporation", and the determination of this question "is always one of fact to be determined from the objective facts and surrounding circumstances."[27] It has also been held that:
 
 
 63
 "The test seems to be whether there was a specific duty on the part of the officer or director sought to be held liable to act or contract in the particular matter as the representative of the corporation."[28]
 
 
 64
 The record before us does not disclose that the District Court ever focused on the contention of Joel that the opportunity to buy the stock came to him in his individual capacity in a non-corporate matter lying outside the field of his duties as a director of Kay, and hence that his ownership of the stock entitled him to decide the price at which he would sell. Certainly the record does not show that the court distinguished between the private rights of a director and a director's official obligations.[29]
 
 
 65
 We think a genuine and material factual issue-not subject to foreclosure by summary judgment-was presented in Joel's claim that the involved stock was his own and that by virtue of his ownership he had the right to specify the price at which he would sell.
 
 VI
 
 66
 Finally we center our attention upon the claim of the defendants Cecil and Hirshman that the District Court improperly employed the summary judgment procedure to resolve the disputed factual issue over whether as directors of Kay they acted in good faith. Absent a factual determination that they failed to act in good faith, these defendants maintain that liability may not be imposed upon them.
 
 
 67
 Admittedly, neither Cecil nor Hirshman received from the stock purchase by Kay any profit or proceeds whatever. In the transaction itself they had no direct adverse personal interest.[30] They did not stand on both sides of the transaction. Both were stockholders of Kay and there is no showing in the record of any plausible motive for them to damage their personal interests as stockholders by having Kay pay more for the subsidiary shares than they were worth to the corporation. Common sense would seem to indicate that there was no intent to injure their own investments.
 
 
 68
 "The acts of directors are presumptively acts taken in good faith and inspired for the best interests of the corporation, and a minority stockholder who challenges their bona fides of purpose has the burden of proof."[31]
 
 
 69
 "It has been established by the Delaware decisions that in the absence of evidence to the contrary the judgment of directors in fixing the terms and conditions of a sale, as in any other corporate act, is entitled to the presumption that it was exercised honestly and in good faith."[32]
 
 
 70
 The stated presumption of good faith falls when the votes of interested directors are necessary for approval of the corporate action under attack.[33] In the instant case, however, the record shows that no interested director voted on Kay's acquisition of the stock. Joel was the sole interested director and he did not vote. Accordingly the burden of showing the existence of bad faith or such abuse of discretion as to amount to legal waste rests upon the plaintiff Weiss.[34]
 
 
 71
 We think a triable issue of material fact exists as to whether Cecil and Hirshman as directors of Kay acted in good faith.
 
 VII
 
 72
 The record does not show affirmatively that the defendants would not be entitled to prevail under any discernible circumstances, and we cannot say as a matter of law that summary judgment against them was warranted. Accordingly, the grant of summary judgment is reversed, and the case remanded for trial on the merits.
 
 
 73
 Reversed and remanded.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(c) (1970)
 
 
 [1]
 Due to lack of service the action was dismissed as to other named directors
 
 
 [2]
 For convenience these shares are hereinafter referred to as the subsidiary shares
 
 
 [3]
 Fed.R.Civ.P. 56(c); See also Sartor v. Arkansas Gas Corp., 321 U.S. 620, 64 S. Ct. 724, 88 L.Ed. 967 (1944)
 
 
 [4]
 Nyhus v. Travel Management Corporation, 151 U.S.App.D.C. -, 466 F.2d 440 (1972)
 
 
 [5]
 Dewey v. Clark, 86 U.S.App.D.C. 137, 143, 180 F.2d 766, 772 (1950)
 
 
 [6]
 Traylor v. Black, Sivalls & Bryson, Inc., 189 F.2d 213, 216 (8th Cir. 1951)
 
 
 [7]
 Libby v. L. J. Corporation, 101 U.S. App.D.C. 87, 247 F.2d 78 (1957)
 
 
 [8]
 Robert came from a family that had achieved considerable success in the business world, particularly in the operation of a chain of jewelry stores, his wealth was all inherited from his parents, and consisted principally of minority interests in various family enterprises in which he did not actually participate. In and prior to 1947 Robert was intimately and warmly associated and identified with his relatives, he lived with his brother Joel in Washington, D. C., and was particularly attached to and fond of Joel's two minor sons, Richard and Lee. Robert had no liking or aptitude for business and late in 1947 or early 1948 went to New York and took up painting with a great measure of artistic success. There he met the plaintiff, Weiss, who was not a kinsman
 
 
 [9]
 In Re Kaufmann's Will, 20 A.D.2d 464, 247 N.Y.S.2d 664 (1964). The opinion of the court is a part of the record in the instant case
 
 
 [10]
 With the purpose of making way for probate of Robert's earliest will (giving his estate half to his brother Aron and half to his two minor nephews), Joel began a contest of the (next to the last) will giving half of the estate to Weiss, the ground therefor being Weiss' undue influence over Robert
 
 
 [11]
 "[T]he purchase by Joel * * * of the stock in question and its resale to [Kay] was a scheme devised by the Defendants to reimburse Joel * * * for his personal expenses in a will contest unconnected with [Kay's] corporate business * * *."
 
 
 [12]
 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)
 
 
 [13]
 Murray v. Lichtman, 119 U.S.App.D.C. 250, 339 F.2d 749 (1964); Overseas Media Corp. v. McNamara, 128 U.S.App. D.C. 48, 50, n.3, 385 F.2d 308, 310, n.3 (1967)
 13a Joint Appendix, p. 175.
 
 
 [14]
 Joel's attorney at the hearing on the summary judgment motion told the court:
 "Joel Kaufman sought to have the will set aside and a primary motive as he sets out in his affidavit was that he just couldn't live with Weiss and he didn't think that any of these corporations in which he was interested could be decently managed if Weiss was in possession of this stock * *. I think [at] trial there will be a showing that there were efforts of settlement; if [Joel] could get the stock he'd be done with this, but he was not going to permit, if he could possibly avoid it, he was not going to permit Weiss to have stock in these companies * * * and that was [Joel's] primary objective." Transcript of Proceedings, April 30, 1970, p. 22.
 14a Joint Appendix, p. 174.
 14b Id.
 
 
 [15]
 In removing Weiss as temporary administrator of Robert's estate Surrogate Cox in his opinion stated that Weiss "demonstrated incompetence and irresponsibility in the handling of a large estate and in responding to the obligations which the law imposes" and that "it would be hazardous to the estate * * to permit him to continue to function." Opinion of Mr. Surrogate Joseph A. Cox Revoking Letters of Temporary Administration of Walter A. Weiss, N.Y.L.J., August 12, 1964, Page 12, Cols. 2 and 3. The opinion is also found in Exhibit 24 in the instant case, A-122, A-126
 Characteristics of Weiss are touched upon in the opinion of the Appellate Division of the New York Supreme Court concerning the undue influence exercised by him over Robert. This influence amounted to a complete domination and constant exploitation of Robert by Weiss over a period of ten years "to the point of oneness." In Re Kaufmann's Will, supra note 9, 247 N.Y.S.2d 685. Weiss lived with Robert, had power to draw against all of Robert's bank accounts and had unrestricted access to Robert's safe deposit box. "So long as Robert was under his control and influence, Weiss was assured of a life of ease and luxury." Id. at 681.
 The record of the New York Court "is barren of evidence of Weiss's prior training or experience as a financial advisor or business consultant", though he was engaged by Robert as such at an annual "retainer" of $10,000. "We know * * the two proposals he espoused were dismal failures and caused Robert substantial losses and expenses." Id. at 679. (This referred to a sole investment in a garage construction enterprise, known as Multi-Deck in which Weiss' brother was the principal, wherein Robert invested $120,000 and the end result was a total loss; and to the partnership formed by Weiss and Robert to operate a business as "financial consultants", which business never acquired a client and earned no fees during the 10 years of its existence.)
 There are references also in the opinion of the New York Court to the facts that Joel was active in the management of the Kaufmann family business (relating principally to the operation of a national chain of over 80 jewelry stores); that Robert was dependent on Joel as to matters of investments and management which were attended to by Joel without expense to Robert; that "Joel presented an insurmountable obstacle to Weiss's full and complete control of Robert's financial affairs", Id. at 669; that there had been a "skillfully executed plan by Weiss to gain the confidence of Robert [and] displace Joel as manager of his financial affairs", Id. at 681; that-as the jury could reasonably have concluded-Weiss "conveyed to Robert false accusations as to Joel's integrity", Id. at 674, and "wilfully alienated Robert from his family by falsely accusing Joel of fraud and mismanagement in the conduct of the family business enterprises", Id. at 682; and that among Weiss' intrusions upon various Kaufmann family enterprises was his instigation in 1953 of litigation in which Robert sought to block the formation of Kay.
 Weiss did not testify at the will contest trial. However, he gave pretrial testimony. In its opinion the court cites respects in which "the jury could have found Weiss lied deliberately" and recounts Weiss' "deliberately false pretrial testimony." Id. at 682, 684.
 
 
 [16]
 Joint Appendix, p. 169
 
 
 [17]
 Perhaps more illumination price-wise would be in the record but for the position Weiss took in the District Court that Joel must return to Kay the difference between the auction price he paid and the price later paid to him by Kay, without regard to Joel's acquisition expenses or to the true value of the stock
 
 
 [18]
 Transcript of Proceedings of April 30, 1970, p. 9. The court said: "Well, if your case depends on showing that this was an excessive price, not only an excessive price, but the amount of the excessive price, then surely you've got to dispute a material fact in here."
 
 
 [19]
 Fed.R.Civ.P. 56(c) and (e)
 
 
 [20]
 Wittlin v. Giacalone, 81 U.S.App.D.C. 20, 154 F.2d 20 (1946). The complaint itself does not allege that a corporate purpose was lacking in Kay's acquisition of the stock
 
 
 [21]
 We recognize, of course, that upon a trial on the merits the facts may appear differently
 
 
 [22]
 Rogers v. Guaranty Trust Co., 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1933); Mayflower Hotel Stock P. Com. v. Mayflower H. Corp., 89 U.S.App.D.C. 171, 193 F.2d 666 (1951)
 
 
 [23]
 Blish v. Thompson Automatic Arms Corporation, 30 Del.Ch. 538, 64 A.2d 581, 593, 603 , 604 (1948). In Sterling v. Mayflower Hotel Corp., 33 Del.Ch. 293, 93 A.2d 107 (1952), the Delaware Supreme Court states at page 119 that Blish, supra, "merely approves a general rule of the common law." See also Warshaw v. Calhoun, 221 A.2d 487 (Del.1966)
 23a The text of Sec. 144(a) of the Delaware corporation law reads as follows:
 "No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:
 (1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or
 (2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or
 (3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee, or the shareholders."
 
 
 [24]
 The law as to corporate opportunity is settled in Delaware by several decisions of the Delaware Supreme Court. Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503 (1939); Johnston v. Greene, 35 Del.Ch. 479, 121 A.2d 919 (1956); Equity Corp. v. Milton, Del., 221 A.2d 494 (1966)
 
 
 [25]
 It is stated in 3 Fletcher, Cyclopedia of the Law of Private Corporations (1965), Sec. 885:
 "The doctrine that a director or other officer of a corporation cannot obtain a profit or advantage in dealings on behalf of the corporation only applies where the officer is acting for the corporation, or for some other reason owes a duty to the corporation which is inconsistent with his obtaining the profit or advantage. By the weight of authority, * * * the fact that a person is a director or other officer of a corporation does not prevent him from entering into a contract with the corporation, or selling it property, or purchasing property from it, etc., if the corporation is represented by other officers. and there is no fraud."
 
 
 [26]
 Joint Appendix, p. 52
 
 
 [27]
 Equity Corp. v. Milton, 221 A.2d 494, 497 (Del.1966). See also Johnston v. Greene, 35 Del.Ch. 479, 121 A.2d 919 (1956)
 
 
 [28]
 Gottlieb v. McKee, 34 Del.Ch. 537, 107 A.2d 240, 243 (1954). See also Burg v. Horn, 380 F.2d 897 (2nd Cir. 1967); Diedrick v. Helm, 217 Minn. 483, 14 N.W.2d 913 (1944); Thilco Timber Co. v. Sawyer, 236 Mich. 401, 210 N.W. 204 (1926)
 
 
 [29]
 Indeed the judge seemed preoccupied with the idea that Joel had misappropriated a corporate opportunity belonging to Kay. At the beginning of the oral hearing on Weiss' motion for summary judgment the judge indicated that the gist of the case was "a corporate opportunity that a director took personal advantage of." When later Joel's counsel suggested to the court that Weiss' attorney had "ruled" out any "corporate opportunity problem here", the judge admonished: "Don't rule it out because I might rule it back in." Subsequently the court inquired of Joel's counsel as to "why didn't the corporation advance the funds" for the will contest, and why Joel "didn't * * * arrange for the corporation to buy [the stock] at the auction sale." These inquiries seem to imply that the court's reasoning was of the involvement of a corporate opportunity. However, the reason stated by the court for its grant of summary judgment was the scheme theory already related. Transcript of Proceedings, April 30, 1970, pp. 3, 19, 30
 
 
 [30]
 For a definition of a "direct adverse personal interest" see Karasik v. Pacific Eastern Corporation, 21 Del.Ch. 81, 180 A. 604, 607 (1935). See also Piccard v. Sperry Corp., 48 F.Supp. 465 (2 Cir. 1943), aff'd 152 F.2d 462 (2nd Cir. 1946), where the court held that a corporate director whose wife owned stock in a company with which the corporation was contracting was not an interested director
 
 
 [31]
 Warshaw v. Calhoun, 221 A.2d 487, 493 (Del.1966)
 
 
 [32]
 Gropper v. North Central Texas Oil Company, 35 Del.Ch.198, 114 A.2d 231, 233 (1955)
 
 
 [33]
 Id
 
 
 [34]
 Warshaw v. Calhoun, 221 A.2d 487 (Del.1966)