[No. B069066. Second Dist., Div. Four. Mar. 30, 1995.]

HAIG KELEGIAN et al., Plaintiffs and Appellants, v.
JASMINE MGRDICHIAN et al., Defendants and Respondents.

COUNSEL

Gansinger, Hinshaw & Buckley, James M. Gansinger, Bruce D. Berls, Brian L. Buckley and Edward J. Horowitz for Plaintiffs and Appellants.

Bryan Cave, Thomas J. McDermott, Jr., and Howard O. Boltz, Jr., for Defendants and Respondents.

OPINION

HASTINGS, J.—On December 31, 1986, John Mgrdichian (Mgrdichian), a member of the board of directors (Board) of the California Commerce Club, Inc. (Corporation), purchased 200 shares, 14 percent of the outstanding shares, of Corporation stock from fellow Board member Herbert Stern (Stern). This purchase brought Mgrdichian's holdings to 330 shares, 23 percent of the issued and outstanding shares of the Corporation. After Mgrdichian's death on November 26, 1990, plaintiff and appellant shareholders Haig Kelegian (Kelegian), Zack Anter (Anter), Harry Massman

(Massman), and Peter Lynch (Lynch) (collectively as appellants), brought a legal action on behalf of the Corporation and against Jasmine Mgrdichian, individually and as representative of Mgrdichian's estate, and the Corporation (collectively as respondents). Appellants contended that Mgrdichian's purchase of shares from Stern should be voided because the purchase was a misappropriation of a corporate opportunity. After a court trial, the court found appellants had failed to carry their burden of proof to establish that the corporation had set a specific policy to repurchase shares of the corporation. Accordingly, judgment was entered in favor of respondents.

Appellants proffer two arguments on appeal. The essence of their first argument is that the uncontradicted evidence established the existence of a corporate opportunity as a matter of law. The second argument is that the trial court erroneously determined that the defense of laches also prevented recovery by appellants. We have determined the evidence does not, as a matter of law, support the conclusion that Mgrdichian usurped a corporate opportunity and substantial evidence supports the finding of the trial court that there was no policy of the corporation to repurchase corporate shares. Therefore, there was no usurpation of a corporate opportunity. Given this conclusion, it is unnecessary to address appellants' remaining contention relating to the doctrine of laches. We affirm the judgment.

THE FACTS OF THIS CASE

The business of the Corporation is a card game casino in the City of Commerce.

In February of 1984, it was determined that Board member W. Patrick Moriarty, who owned 580 shares of the Corporation, may have illegally taken millions of dollars from the Corporation. A written settlement between Moriarty and the Corporation required Moriarty to give the Corporation all but 200 of his shares in exchange for the promise of the Corporation that it would not sue him. It also prohibited Moriarty from transferring or selling more than 80 of his remaining shares to any one entity or individual. Kelegian testified at trial the Board wanted to make sure that in the future the Corporation did not become subjected to the power of one individual.

In May 1985, Mgrdichian became a shareholder when he purchased 20 shares of corporate stock at $2,350 a share. At the October 3, 1985, Board meeting, a letter from Mgrdichian to Herbert Stern, president of the Corporation, was read to the directors present. It expressed Mgrdichian's intent to become a "more substantial" stockholder. Sometime during that month he purchased 40 more shares of stock at $3,250 a share. On October 17, 1985,

the Board elected Mgrdichian a member of the Board. On March 20, 1986, Mgrdichian purchased 30 more shares at $4,000 a share from Albert Petrosian. By letter dated March 28, 1986, Mgrdichian informed appellant Lynch that he held a total of 90 shares and was interested in purchasing additional shares as a long-term investment.

Kelegian testified that at the April 8, 1986, Board meeting he warned that Mgrdichian was actively soliciting points and shares in the Corporation and, if Mgrdichian, as a Board member, continued to solicit points and shares, he may expose himself to legal actions to void such transactions by dissatisfied sellers. Mgrdichian responded that he was acting as an individual and not as a Board member in any such purchases. A heated discussion then took place in which Kelegian accused Mgrdichian of attempting to take over the Corporation and violating his fiduciary duties as a director in soliciting shares. The Board took no action.

On May 22, 1986, Mgrdichian purchased 20 more shares at $3,500 a share from Carl Agajanian.

In June of 1986, the fortunes of the Corporation took an upswing. The card club added the so-called "Asian Games" to its card game activities, and revenues steadily and rapidly increased.

In August of 1986, the stockholders discussed whether the Corporation should be reorganized as a limited partnership. All agreed that such reorganization would not affect their existing proportionate ownership of Corporation stock.

At the August 26, 1986 Board meeting, Stern announced his resignation as president and indicated that his 200 shares of Corporation stock may be for sale.

On September 11, 1986, Mgrdichian purchased 20 more shares at $4,000 a share from Board member Ross. They also executed an agreement which gave Mgrdichian the right of first refusal on the sale of any of Ross's remaining 65 shares. The agreement was acknowledged by George Tumanjan, president of the Corporation.

At the stockholder meeting of September 23, 1986, consultant Andy Seligman informed the stockholders that recent information had impacted the proposed reorganization of the Corporation as a limited partnership. The Internal Revenue Service had determined that the Corporation no longer qualified for tax treatment under subchapter S because it had exceeded the

maximum number of shareholders permitted, and there was a possibility that the stockholders would be assessed back taxes. The stockholders authorized the Board to acquire a sufficient number of shares necessary to reduce the number of stockholders to 35 and thereby regain subchapter S status. The Board agreed that if the attempt to qualify under subchapter S was unsuccessful, the Board would not proceed with the limited partnership plan. The record reflects that the repurchase of shares was successful, and on November 11, 1986, Seligman informed the Board that approval for filing for subchapter S had been received and that he had filed for such status on behalf of the Corporation with the Internal Revenue Service.

On December 31, 1986, Mgrdichian purchased Stern's 200 shares at $5,000 a share. From the August date that Stern had announced his shares were available for purchase, and until Mgrdichian purchased them, no other Board member had expressed an interest in purchasing the shares. On January 6, 1987, Mgrdichian informed the Board that he had purchased the 200 shares from Stern.

All of the stock transfers to Mgrdichian were signed by appellant Anter as secretary of the Corporation. He testified that he would not have signed any of the transfers if they had been illegal, but that Mgrdichian's purchases were highly controversial and Mgrdichian was criticized for not having offered to acquire Stern's shares on behalf of the Corporation.

Under questioning by the trial court, counsel for appellants and appellant Kelegian indicated they knew of no corporate document that used the word "policy" and reflected that the Corporation had right of first refusal in purchasing corporate stock prior to Mgrdichian's purchase of Stern's stock in December 1986. Kelegian also answered that there was no effort to inform non-board member shareholders of any such purported policy and that the Board did not expect those shareholders to adhere to the purported policy.

### THE RULING BY THE TRIAL COURT

The trial court considered this a close case. In issuing the statement of decision, the court reviewed the evidence and determined that there was insufficient evidence to satisfy it that any corporate policy had in fact been established which formed the basis for a corporate opportunity.

"If you have an agreement on a subject, if it isn't too important people oftentimes do it orally. If it is very, very significant, people generally put it in writing because it is very important and they understand that memory fades and that proving the terms of an oral agreement are difficult; similarly,

with Board meetings when matters of relative insignificance are discussed, there may be things that are talked about that are not memorialized in resolutions. But generally, I think business people understand, lay people, and, certainly, lawyers do[,] that if it is a matter of significance, of any importance at all, that it is only prudent to memorialize it in the minutes, especially when you have minutes and you have resolutions. To then come later and say I know we didn't put it in the form of a motion and I know we didn't vote on it, but I think everybody had similar comments is a very uphill battle for a plaintiff. And I don't think that is a matter that these plaintiffs would not be familiar with, from seeing them on the stand and from their business backgrounds.

"Therefore, when we take into consideration all of the evidence about what the [Corporation's] policy was and what the basis of the policy was and we take into consideration the conduct of the parties thereafter, as a trier of fact, I am compelled to find there was no action taken by the Board that would constitute an expression of the Corporation's interests.

"I have no doubt that various directors to various degrees had various interests that the Corporation acquire shares when they became available. I do believe that these interests varied in intensity and degree and from time to time among the directors. And they probably got more intense as the fortunes of the corporation looked better.

"But if this kind of claim was to be successful, the plaintiffs would have to have some fairly persuasive evidence because of the conduct and, I think, the fact that plaintiffs delayed so long in doing anything normal about asserting a claim or trying to enforce the rights, the rights of the corporation, is two reasons that this claim must be denied."

DISCUSSION

1. *The concept of corporate opportunity:*

■ "The law has long recognized the doctrine of corporate opportunity which prohibits one who occupies a fiduciary relationship to a corporation from acquiring, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence. [¶] . . . [¶] Three tests have been recognized as standards for identifying a corporate opportunity: the 'line of business' test, the 'interest or expectancy' test, and the 'fairness' test. Under any test, a corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage. *Whether or not a given opportunity meets*

*the requisite relationship is largely a question of fact to be determined from the objective facts and surrounding circumstances existing at the time the opportunity arises. Whether or not an officer has misappropriated a corporate opportunity does not depend on any single factor.*" (3 Fletcher Cyclopedia Corportations (1994 rev.) § 861.10, p. 284, italics added, fns. omitted.)

California recognizes this doctrine and also recognizes that whether or not a corporate opportunity exists is primarily a factual question. (*Thompson* v. *Price* (1967) 251 Cal.App.2d 182, 190 [59 Cal.Rptr. 174].) However, no California authority addresses the concept in the context of purchase of corporate shares by a director—the facts presented here.

This factual situation was addressed in *Zidell* v. *Zidell* (1977) 277 Ore. 560 [560 P.2d 1091, 16 A.L.R.4th 777], a case with facts similar to ours. The court was confronted with whether or not the corporation was indeed interested in repurchasing its own shares. The court noted: "As a general rule, a director violates no duty to his corporation by dealing in its stock on his own account. Plaintiff, however, contends that the rule should be otherwise when the stock is that of a closely-held corporation and the purchase is made at a favorable price and for the purpose of affecting control of the corporation. He argues that Rosenfeld's stock was sold at a bargain price and that the corporations had an interest in insuring that all the shareholders benefitted equally from such a purchase. [¶] We will accept, for purposes of this opinion, plaintiff's contention that the price paid Rosenfeld for the stock was low in comparison to the stock's actual value and that this purchase, therefore, was a bargain. Nevertheless, we disagree with plaintiff's contention that the bargain was one which rightfully belonged to the corporations. [¶] *Plaintiff presented no evidence that the corporations have made a practice of purchasing their own stock or that they ever contemplated doing so in order to maintain proportionate control, and .there is no basis for inferring an agreement to that effect. Absent such a corporate policy, there is normally no special corporate interest in the opportunity to purchase its own shares.* [Citations.]" (*Zidell* v. *Zidell, supra,* 560 P.2d at pp. 1092-1093, italics added, fns. omitted.)

2. *Application to this case:*

 Appellants contend that the trial court accepted appellants' evidence for the propositions that: there was an "uncontroverted longstanding corporate objective of maintaining proportionate ownership"; and there was an "uncontroverted interest by the shareholders and directors to repurchase as many of the corporation's shares as could be had, commencing in approximately mid-September 1986, when the corporation's revenue began

to skyrocket." They then argue that the trial court erred by finding that such "corporate objectives may not, as a matter of law, constitute corporate opportunities."

At oral argument, counsel for appellants clarified their argument by stating that, as a matter of law, whenever directors speak of potentially purchasing shares on behalf of the corporation, the purchasing director is on notice of a corporate opportunity and the purchasing director acts at his own peril in buying the stock.

Appellants' argument is flawed in two important specifics. First, we disagree with appellants' argument about what establishes a corporate opportunity. Second, while there is evidence in the record indicating that some of the directors harbored concerns about proportionality and openly spoke about them, there was no formal corporate action taken upon which the court could base a finding of the existence of a "beachhead" to establish a corporate opportunity. The court found that: ". . . when we take into consideration all of the evidence about what the [Corporation's] policy was and what the basis of the policy was and we take into consideration the conduct of the parties thereafter, as a trier of fact I am compelled to find that there was no action taken by the Board that would constitute an expression of the Corporation's interests."

Of the three tests referred to in Fletcher, *supra*, the "interest or expectancy test" is the closest to appellants' argument. "The 'interest or expectancy' test precludes acquisition by corporate officers of the property of a business opportunity *in which the corporation has a 'beachhead' in the sense of a legal or equitable interest or expectancy growing out of a preexisting right or relationship.* . . . [¶] In determining whether an officer may take advantage of a business opportunity in which a corporation is interested, courts consider whether the corporation had an interest, actual or expectancy, in the opportunity, and whether the acquisition by the officer would hinder or defeat plans of the corporation in carrying on or developing legitimate business for which it was created. In addition the courts may also consider whether the corporation has the financial resources to take advantage of a particular business opportunity." (3 Fletcher Cyclopedia Corporations, *supra*, § 861.30 at pp. 296-297, fns. omitted.)

This is simply a substantial evidence case.

The evidence established that in May 1985, October 1985 and March 1986, Mgrdichian purchased 90 shares of stock. In April 1986, Kelegian noted these purchases for the record and advised that Mgrdichian may be

opening himself up to liability from dissatisfied sellers since Mgrdichian was a Board member. Mgrdichian took exception to this and advised he was purchasing for his own account. A heated discussion then took place. In May 1986, Mgrdichian purchased 20 more shares for himself. In September 1986, he purchased 20 more shares and also entered into a contract for right of first refusal to buy the remaining shares of the same shareholder. This right of first refusal was acknowledged by the president of the Corporation. No corporate resolution was ever passed and no action was ever taken to prevent or void any of these transfers. In August 1986, Stern advised that his shares were available for purchase. In September 1986, the Board decided to repurchase shares to bring the number of shareholders down to 35 or less to qualify for subchapter S treatment. This was apparently accomplished by November 1986. Finally, in December 1986, Mgrdichian purchased the 200 shares from Stern. At no time did any other Board member indicate an interest in buying these shares, even at the time when the Board had decided to repurchase shares to bring the number of shareholders down to 35 or less. No attempt was made to set aside this transfer until after Mgrdichian's death four years later.

The record reflects that the Corporation achieved its goal of reducing the number of stockholders to 35 to qualify for subchapter S treatment by November 11, 1986, approximately 7 weeks before Mgrdichian purchased the 200 shares from Stern. No document included in the record on appeal reflects appellants' claimed policy of a continuing corporate interest in acquiring shares beyond achieving the goal of qualifying for subchapter S tax treatment. Although appellants testified at length as to their understanding that such a policy existed before the December 31, 1986 purchase, the trial court ultimately found otherwise. During argument it assessed appellants' credibility as follows: "[E]ither they are telling the exact truth or they are lying, which I, frankly, don't believe[,] or the third possibility is that they over a long period of time have told and retold this story so often that it has become real to them. And what was just conversation when it really happened has over the years become real policy, a real corporate policy [to them]." Determinations of credibility rest exclusively with the trier of fact. (*New* v. *New* (1957) 148 Cal.App.2d 372, 384 [306 P.2d 987].)[1]

---

[1]An annotation at 16 A.L.R.4th 784 reviews various cases from around the country dealing with purchase of shares of a corporation by a director or officer in connection with whether the purchase was a "corporate opportunity." A review of those cases shows that the facts of this case are distinguishable from those situations where a corporate opportunity has been found to or may exist: In *Perrott* v. *United States Banking Corporation* (D.C.Del. 1944) 53 F.Supp. 953, the court found a cause of action stated for usurpation of a corporate opportunity when an officer or director of a corporation had purchased shares of the corporation for 50 to 75 cents a share and resold them to the corporation for $4 and $9 a share; in *Weiss* v. *Kay*

The record supports the trial court's finding that the actions of the parties belied any corporate interest or intent to repurchase Stern's shares for the benefit of the corporation. No "beachhead" was established.

### DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Vogel (C. S.), J., concurred.

Appellants' petition for review by the Supreme Court was denied June 29, 1995.

---

*Jewelry Stores, Inc.* (1972) 470 F.2d 1259 [152 U.S.App.D.C. 350], a summary judgment was reversed and the matter was returned to the trial court to decide if a corporate opportunity existed, based upon assertions that a director had purchased corporate shares at a public auction for a price less than that at which he intended to resell them to the corporation; in *Faraclas* v. *City Vending Company* (1963) 232 Md. 457 [194 A.2d 298], the trial court found that the corporation had in fact declared a policy to purchase outstanding stock for its own benefit; in *Kelly* v. *74 & 76 West Tremont Avenue Corporation* (1956) 4 Misc.2d 533 [151 N.Y.S.2d 900], a director had been selected by the corporation to negotiate the purchase of corporate shares from a shareholder on behalf of the corporation but failed to disclose a secret deal he made for himself with the shareholder; in *Breswick & Co.* v. *Briggs* (D.C.N.Y. 1955) 135 F.Supp. 397, the court held that summary judgment should not be granted because the issue of whether a corporate opportunity exists is one of fact; in *Hubbard* v. *Pape* (1964) 2 Ohio App.2d 326 [203 N.E.2d 365], a corporate resolution was adopted which required a stockholder to first offer to sell or dispose of the stock to the corporation; in *Sladen* v. *Rowse* (1975) 115 R.I. 440 [347 A.2d 409], the court found that the evidence proved the company intended to purchase stock from a shareholder on behalf of the corporation, therefore a corporate opportunity existed; in *Lash* v. *Lash Furniture Co.* (1972) 130 Vt. 517 [296 A.2d 207], the court found that a director had violated his fiduciary duty by purchasing shares of the corporation for his own benefit after voting against a defeated motion that the corporation purchase shares for its own benefit.